[Southern Express Company v. The State.]

# Southern Express Company *v.* The State.

*Injunction to Prevent Whisky Nuisance.*

(Decided June 30, 1914. 66 South. 115.)

1. *Commerce; Regulation; Statutes; Construction.*—The Fuller Bill (Acts 1909, p. 63), prohibits intrastate shipments of intoxicating liquors, except when made for purposes therein stated, but does not attempt to prohibit interstate shipments.

2. *Same; Federal Statutes; Construction.*—The Webb Law (37 Stat. 699) does not prohibit the transportation of intoxicating liquors from one state into another, except where the liquors are to be received, possessed, or in some way used as prohibited by the laws of the latter state, and from such liquors so imported it merely withdraws their interstate character and their immunity from state regulations, and as so construed, it is a valid exercise of the power of Congress to regulate interstate commerce.

3. *Same; Liquor Traffic; Prohibition.*—Under the Webb Law, the Carmichael Bill (Acts 1909, p. 8), and the Fuller Bill (Acts 1909, p. 63), an interstate carrier is not prohibited from bringing into the state intoxicating liquors, except only such as are intended for unlawful use in the state, and a carrier in possession of liquors for delivery to a person who intends to use the same in violation of the state law, or a carrier delivering in a state liquor to a person in the state intending to use the same illegally, violates the state law, unless it has no knowledge of such unlawful purpose.

4. *Intoxicating Liquors; Prohibition; Statute.*—The Carmichael and Fuller Bills cover, within the state, all liquors which no person can lawfully have in his possession, and since the passage of the Webb Law, interstate traffic in such intoxicating liquors for unlawful use in the state is prohibited.

5. *Same; Regulation.*—Under the Federal penal code, section 240, 35 Stat. 1137, a common carrier of interstate commerce is apprised of the character of the shipment when intoxicating liquor is received by it, and under the Webb Law, before it delivers the liquor to the consignee in the state, it should inform itself of the purpose of the consignee, and where it has liquor in its possession for delivery to a person intending to use it in violation of a state law, or actually delivering it in the state to such person, such carrier is presumptively guilty of a violation of the law of the state.

6. *Same; Violation; Injunction; Bill.*—A bill by the state against an interstate carrier to enjoin the maintenance of a liquor nuisance which alleges that the carrier has warehouses where goods received are stored to await delivery to the consignee; that "prohibited liquors" are received at the warehouses in large quantities, and at frequent intervals, for delivery to individuals for illegal purposes; that prohibited liquors are received by the carrier for distribution or delivery contrary to the laws of the state, and that it is main-

[Southern Express Company v. The State.]

taining a liquor nuisance, charges a violation of the law by the
carrier authorizing injunctive relief; the words "prohibited liquors"
meaning intoxicating liquors, which under the Acts of 1907, p. 71,
Special Session, the carrier has not the legal right to have in its pos-
session.

7. *Same.*—Where a carrier of interstate commerce, in good faith,
and after proper investigation, delivers liquor to a consignee without
knowledge that the same is intended by the consignee for illegal use
in the state, the carrier does not violate any of the laws of the state.

8. *Same; Nuisance; Injunction.*—To justify a departure from the
rule that an injunction should be dissolved on a sworn answer deny-
ing the averments of the bill, it must be apparent that irreparable
mischief will follow, or some circumstance peculiar in its nature
must exist; where a carrier, respondent in a suit, to enjoin it from
maintaining a liquor nuisance, alleges under oath that it has not in
any way acted in violation of any laws of the state by engaging in
interstate commerce in liquors, a preliminary injunction restraining
it should be dissolved.

APPEAL from Morgan Law and Equity Court.

Heard before Hon. THOMAS W. WERT.

Suit by the State, by its solicitor, against the South-
ern Express Company to enjoin the maintenance of a
whisky nuisance. From a decree overruling demurrers
to the bill, and a motion to dissolve a temporary injunc-
tion, defendant appeals. Reversed, rendered, and re-
manded.

The bill alleges in effect that the Southern Express
Company is a common carrier in and through Morgan
county, Ala., doing an inter and intra state business,
and in Decatur and other points in said county it main-
tains depots, warehouses, or storage places where goods
received by it destined for Decatur are kept or stored
until they are delivered to consignees, and that it keeps
in said depots, warehouses, or storage places prohibited
liquors for distribution or delivery contrary to the laws
of the state; that it has frequently received at such ware-
house or storage place whisky to be delivered to John
Milligan and Ellis Wright in Morgan county, Ala., and
that such shipments have been received in large quan-
tities and at frequent intervals, and that said liquors are

kept and stored in such warehouses in large quantities and at frequent intervals to be delivered to individuals for illegal purposes, and that it has maintained a common nuisance or liquor nuisance in violation of law. It is then alleged that it is not a druggist, and does not keep a drug store or maintain a drug store at the above-mentioned storehouses or warehouses, and that the buildings above mentioned are not used exclusively for warehouses. Answering the bill, the express company admitted that it was a common carrier in and through Morgan county, and that it maintained depots and warehouses as charged in the bill at Decatur, where goods received by it for transportation or delivery to persons in Morgan county are stored and kept in pursuance of the contract of transportation. That it is a common carrier engaged in intra and inter state transportation, and under its duty as such is bound to receive and transport shipment of liquors from points without the state of Alabama to points within the state, but that these liquors were not intended to be received, possessed, sold, or otherwise used in violation of law so far as this respondent is advised, and it denies that it has or keeps on hand prohibited liquors or stores prohibited liquors in Morgan county, or that it is maintaining a common or liquor nuisance in violation of the law. Then follows a detailed statement of the character of the shipments made to the persons named in the bill, and the conferences held between this corporation and the representatives of the state of Alabama as to the shipment right, it being alleged that the shipment to Milligan had been delivered before this corporation was informed that the shipment was for illegal purposes. The answer admits that the corporation is not a druggist and does not keep a drug store at the places mentioned in the bill. The bill then sets up the interstate commerce regulation and the in-

terstate commerce clause of the Constitution, and that
the bill seeks an injunction against the lawful and or-
derly conduct of lawful interstate commerce regulation
and the interstate commerce clause of the Constitution,
and that the bill seeks an injunction against the law-
ful and orderly conduct of lawful interstate commerce,
and that the Webb bill does not confer upon the agent
of the state of Alabama, nor upon the state itself the
power contended for in the bill, and that the said bill
known as the Webb bill, or as the Webb-Kenyon bill, is
unconstitutional and void, as violative of article 1, sec-
tion 8, article 4, section 2, and of the Fourteenth amend-
ment of the Constitution of the United States, and be-
cause it undertakes to subject this defendant to loss of
property and property rights because some person other
than this defendant entertains an intent to violate the
laws of the state, to which said shipment was destined,
and because it attempts to give extraterritorial effect to
the laws of the state, and to enable that state to annul
and defeat contracts made without the state of Alabama
and to deprive this defendant of its property rights to
carry such shipments as interstate commerce.

Robert C. Alston and Eyster & Eyster, for appel-
lant. In the absence of some circumstances peculiar to
the case, or where irreparable mischief will result, a
temporary injunction should be dissolved upon the filing
of the sworn answer containing unequivocal denial of
all the charges on which the right to an injunction rests.
—Johnson v. House, 154 Ala. 496; Weeks v. Bynum,
158 Ala. 231; Long v. Shepherd, 159 Ala. 595; Rogers
v. Bradford, 29 Ala. 474; Hartley v. Matthews, 96 Ala.
226; L. & N. v. Philyaw, 94 Ala. 463; 22 Cyc. 988. The
answer shows that the shipments were interstate ship-
ments, and that the court was powerless to prevent these

deliveries under the statements of fact in the answer.—
135 U. S. 100; 223 U. S. 70; 129 Ky. 420; 170 U. S. 412;
203 U. S. 270. Counsel insists that the Webb-Kenyon
Law is unconstitutional.—*L. & N. v. Cook B. Co.*, 223
U. S. 70; 170 U. S. 412; 170 U. S. 438; 5 How. 504; 125
U. S. 465.

R. C. BRICKELL, Attorney General, T. H. SEAY, Assistant Attorney General and MELVIN HUTSON, for appellee. No brief reached the reporter.

DE GRAFFENRIED, J.—The Carmichael bill (Acts
Sp. Sess. 1909, pp. 8-13) and the Fuller bill (Acts Sp.
Sess. 1909, pp. 63-96) are expressive of the law of this
state on the subject of intoxicating liquors and beverages, except in so far as their provisions have been
expressly or impliedly repealed by the Parks bill (Gen-
Acts 1911, pp. 26-31) and the Smith bill (Gen. Acts
1911, pp. 249-288).—*Southern Express Co. v. I. Brick-
man Co.*, 187 Ala. 637, 65 South. 954; *State ex rel.
Crumpton v. Montgomery*, 177 Ala. 212, 59 South. 294;
*Western Railway v. Capital Brewing Co.*, 177 Ala. 149,
59 South. 52; *Hauser v. State*, 6 Ala. App. 31, 60 South.
549.

The Fuller bill prohibits intrastate shipments of intoxicating liquors and beverages, except when such shipments are made for certain recognized legal purposes,
and the provisions of the Fuller bill are now operative
as to such shipments in all parts of the state except those
embraced within the territory in "wet towns or cities."
—*Southern Express Co. v. I. Brickman Co., supra.* The
Fuller bill does not, however, prohibit or attempt to
prohibit, the transportation of intoxicating liquors or
beverages from some other state or territory into the
state of Alabama.—Section 24, Fuller bill, pp. 86, 87,

[Southern Express Company v. The State.]

Acts Sp. Sess. 1909; *Southern Express Co. v. I. Brick-man Co., supra.*

The Legislature, in adopting the Fuller bill, recognized that when an article is delivered to a common carrier in one state, for transportation to and delivery in another state, such article is—so far as the question now under consideration is concerned—from its receipt by the common carrier until its orderly delivery to the consignee, within the sole jurisdiction of the federal government, and that it does not come within the jurisdiction of the state to which it is shipped until, in due course of business, it is delivered to the consignee.

(2) Since the adoption of the Fuller bill the Congress of the United States has adopted what is familiarly known as the "Webb Law."—Act March 1, 1913, c. 90, 37 Stat. 699. This bill was passed, over the veto of the President, in March, 1913, and is in the following language: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled. That the shipment or transportation in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented or other intoxicating liquor of any kind, including beer, ale, or wine, from one state, territory, or district of the United States or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into any state, territory or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into any state, territory or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, directly or indirectly or in any manner connected with the transaction, to be received, possessed, or kept, or in

any manner used, either in the original package or otherwise, in violation of any law of such state, territory or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, enacted in the exercise of the police powers of such state, territory, or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, is hereby prohibited; and any and all contracts pertaining to such transactions are hereby declared to be null and void, and no suit or action shall be maintained in any court of the United States upon any such contract or contracts, or for the enforcement or protection of any alleged right based upon or growing out of such contract or contracts, or for the protection in any manner whatsoever, of such prohibited transactions."

The above act, by its terms, does not prohibit the transportation of intoxicating liquor from one state into another state except upon the contingency that the liquor is to be *received, possessed* or *sold* or in some way used in a manner prohibited by the laws of the state into which such liquor is to be, or is in fact, imported. The above act, by its terms, divests intoxicating liquor of its "interstate character," and withdraws from it "interstate protection" at the hands of the federal government only when it is shipped from one state into another state for purposes which, under a valid statute of the state into which it is shipped, are illegal in the state into which it is shipped. In other words, under the terms of the above quoted act, intoxicating liquor, as an article of interstate commerce, is not an outlaw. It is however, as such an article, under certain conditions, an outlaw.

(3) Prior to the passage of the act of Congress approved August 8, 1890, c. 728, 26 Stat. 313 (U. S. Comp. St. 1901, p. 3177), entitled "An act to limit the effect

of the regulations of commerce between the several states and foreign countries," a sale, in the original package in which the article was shipped, by the person who imported the article from one state into another state, was an incident of interstate commerce, and the state into which the article was imported could not prohibit such sale.—*Robbins v. Shelby County Taxing District*, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694; *Leisy v. Hardin*, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128.

The above doctrine grew out of the fact that the states, in adopting the Constitution of the United States, vested in Congress the exclusive power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes," except, indeed, such power as relates to subjects which "do not require the application of a general or uniform system."—*Leisy v. Hardin, supra.*

"Where the subject-matter requires a uniform system as between the states, the power controlling it is vested exclusively in Congress; but where, in relation to the subject-matter, different rules may be suitable for different localities, the states may exercise powers which, though they may be said to partake of the nature of the power granted to the general government, are strictly not such, but are simply local powers which have full operation unless or until circumscribed by the action of Congress in effectuation of the general power."

In other words, from the adoption of the federal Constitution it has ever been held that the power of Congress "to regulate commerce among the states, when the subjects of that power are national in their nature, is exclusive." It has also been held that "the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several

states."—*Robbins v. Shelby County Taxing District, supra; Wilkerson v. Rahrer*, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572.

When, therefore, the Legislature of this state, through the Carmichael bill and the Fuller bill, made it unlawful to sell or give away intoxicating liquors or to transport them except for certain purposes, from any point in the state to any other point in the state, it in no way, in recognition of the above federal power, attempted to prohibit the shipment of intoxicating liquor from another state into this state.

The stringent prohibition laws which became operative in all parts of this state upon the adoption of the Carmichael and Fuller bills to which we have above referred are general laws now operative, as we have already said, in *all* parts of the state, except where an *exception* has been ingrafted upon them through the operation of the Parks and Smith bills, to which reference has also been made. In a few of our towns and cities—not counties—intoxicating liquor may now, within the territory embraced within the corporate limits of such towns and cities, under restrictions which at no previous time have prevailed in the state, be sold. The manner in which, under the provisions of the Parks and Smith bills, the wet cities and towns have been able, through the votes of the people of the counties in which such towns and cities are situated, to except themselves from the general prohibition laws of the state gives emphasis to the public policy of the state to discourage the use and consumption of intoxicating liquors within the state. In furtherance of that policy, it is, except in wet cities and towns, not only unlawful to manufacture, keep for sale, or have in possession for disposition in any way, or sell, give away, or otherwise dispose of, prohibited liquors, but it is also provided that: "The keep-

ing of liquors or beverages that are prohibited by the law of the state to be manufactured, sold, etc., in any building not used exclusively for a dwelling shall be prima facie evidence that they are kept for sale, or with intent to sell the same, contrary to law."

The only protection, in short, which is accorded to intoxicating liquor in the dry territory of the state, except to that which is had for personal use, for the use of druggists, etc., and for communion purposes, is the protection which is accorded to it by the federal laws governing the subject of interstate commerce.

(4) The Webb bill, which we have above quoted, outlaws intoxicating liquors which are shipped into this state from another state, and which are shipped into this state for illegal purposes. Intoxicating liquors which are shipped into this state from another state for illegal purposes are therefore, in so far as this state is concerned, not the subjects of interstate commerce. They are outlaws, and are to be dealt with by the courts as such. Such liquors are not now recognized as legitmate subjects of transportation, and a common carrier caught in the possession of such liquors, liquors which, under the express terms of the Webb bill, it is prohibited from bringing into this state, cannot escape the operation of the laws of this state by showing its own violation of a federal statute, passed confessedly for the purpose of aiding this state in its policy, through prohibitory laws, of encouraging temperance among all of its people.

The prohibition laws of this state, as they now exist, are sufficiently broad to cover all liquors which no person can lawfully have in his possession, and they became immediately operative upon all liquors shipped for illegal purposes into this state from other states, upon the passage of the Webb bill.

"This is not the case of a law enacted in the unauthorized exercise of a power exclusively confided to Congress, but of a law which it was competent for the state to pass, but which could not operate upon the articles occupying a certain situation until the passage of the act of Congress. The act, in terms, removed the obstacle, and we perceive no reason for adjudging that a re-enactment of the state law is required before it can have the effect upon imported liquors which it has always had upon domestic property."—*Wilkerson v. Rahrer, supra; Tinker v. State,* 90 Ala. 638, 8 South. 814.

While section 24 of the Fuller bill deals only with the intrastate shipments, and renders unlawful all shipments of intoxicating liquors, except shipments to druggists, physicians, etc., and while section 36 of the Fuller bill declares that our prohibitory laws shall be so construed as to avoid conflict with "that clause of the Constitution of the United States which confers upon the Congress of the United States the power to regulate commerce with foreign nations and among the several states and with the Indian tribes," a proper construction of the Fuller bill must lead to the conclusion that it was the purpose of the Legislature in that bill to declare that it should be unlawful for any person to have in his possession, or to deliver to any other person at any point in the state, liquors not within interstate protection and which were intended for unlawful use. The construction which is thus placed by us upon the Fuller bill is that construction which is in accord with the well-recognized public policy of the state, and which is enjoined, in section 37 of the Fuller bill, upon all courts in the following language: "This act shall be liberally construed so as to accomplish the purpose thereof, which is to further suppress the evils of intemperance and se-

cure obedience to and the enforcement of the laws of the state for the promotion of temperance and for the suppression of the manufacture of and traffic in prohibited liquors and beverages and to prevent evasions and subterfuges by which such laws may be violated."

For the reasons above stated we are of the opinion that *interstate* commerce cannot, since the passage by Congress of the Webb law, be used as a subterfuge by common carriers or other corporations, firms, or persons for having in their possession or for delivering to any other person liquors intended to be used, not for lawful, but for unlawful, purposes in the state.

"That which does not belong to commerce is within the jurisdiction of the police power of the state, and that which does belong to commerce is within the jurisdiction of the United States."—*Peirce v. New Hampshire,* 5 How. 504, 12 L. Ed. 256; *In re Rahrer,* 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572.

Intoxicating liquors and beverages intended for unlawful use in Alabama are, in so far as the state of Alabama is concerned, since the passage of the Webb bill, not articles of commerce, and cannot claim protection as such.

(5) That the laws of this state which have been passed for the purpose of promoting temperance are violative of no provision of the state or federal Constitution is a proposition about which there is no room for doubt. —*Mugler v. Kansas,* v23 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205. Congress in adopting various prohibitory laws with reference to sales, etc., of intoxicating liquors to the Indians, has clearly indicated that, in the opinion of the federal government, such laws subserve a not unwise public policy when applied to certain localities and peoples under the peculiar protection of the feder-

al government.—*Farrell v. United States* (C. C. A. 1901) 110 Fed. 942, 49 C. C. A. 183.

One of the chief stumbling blocks in the way of the enforcement of local option and prohibitory laws in our various states has been the fact that, while the states could prohibit intrastate commerce in prohibited intoxicating liquors, they were without protection against interstate shipments until the liquors so shipped had found their way into the general mass of property of the state. Experience in prohibition and local option states indicated that, so long as the consignee was under the interstate commerce law, permitted to sell intoxicating liquors in original packages, such liquors found their way, upon the sale by the consignee in the original packages, into channels which were subversive of the public policy of the state which dictated its prohibitory and local option laws. The result was that Congress passed the act of August 8, 1890, to which we have above referred, and which was upheld as constitutional in *Ex parte Rahrer, supra.*

Experience has demonstrated that local conditions in some of our states present problems which in other states do not exist, and that laws which are necessary in some states are needless in others. It is therefore appropriate that, under the broad powers which have been expressly lodged in Congress as the sole custodian of interstate commerce, such regulations of that commerce shall be had at the hands of that body as will assist the various states in enforcing valid statutes enacted by them in furtherance of a public policy which is dictated by their several peculiar needs.

"The power over commerce with foreign nations and among the several states is vested in Congress as *absolutely* as it would be in a *single government,* having in its constitution the same restrictions on the exercise of

power as are found in the Constitution of the United States."—*Gibbons v. Ogden,* 9 Wheat. 1, 6 L. Ed. 23; *Northern Securities Co. v. United States,* 193 U. S. 341-352, 24 Sup. Ct. 436, 48 L. Ed. 679.

The power of a state to prohibit the transportation of intoxicating liquor from a wet part of a state into a dry part of a state, and to be there used in violation of law, is, as we have already said, unquestioned. In this state a large number of our counties are dry counties, and the Legislature of the state, out of respect to the wishes, the needs, and the efforts of a majority of the people in those counties to promote and encourage soberness and temperance, has validly declared that intoxicating liquor shall, except to druggists, etc., not be shipped from any point in the state into those counties. Why, then, if the United States government possesses, in fact, exclusive control over interstate commerce, that government, to meet the needs and efforts of the states to discourage the use of intoxicating liquors, does not possess the power to outlaw from the protection of federal commerce liquors intended for use in such states in contravention of their laws we are unable to see. The power to which we refer must be lodged somewhere. It is not in the states, because they expressly surrendered their power in the premises when they adopted the Constitution. The powers which the states surrendered when the Constitution was adopted were lodged by them in the federal government, and were by the states expressly "vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." The powers vested in Congress, a legislative body, were vested in it in order that the Congress, on the subjects placed within its jurisdiction, might so legislate on such subjects as to promote the general welfare. Congress is not authorized by the Constitution to delegate leg-

islative power to a state, or to any other body, but it has, in several cases, been held to possess the power by general laws, to so regulate certain subjects of interstate commerce as to bring them within the operation of valid statutes of the various states adopted as police regulations of such states, and it has also been held that the mere fact that the states do not possess uniform police regulations in no way affects the validity of such power. —*In re Rahrer, supra; State v. McCarty,* 5 Ala. App. 212, 59 South. 543.

In construing the commerce clause of the federal Constitution, the courts have uniformly held that, in the absence of congressional legislation on the subject, the clause in no way conflicts with the police power of a state to prevent the introduction of noxious articles, for the "protection of life, liberty, health or property within its borders," and to that end may "prevent persons and animals suffering under contagious or infectious diseases from entering the state," etc.—*Railroad Co. v. Husen,* 95 U. S. 465, 24 L. Ed. 527; *Gibbons v. Ogden,* 9 Wheat. 1, 6 L. Ed. 23.

Without regard to the reasoning upon which the declaration by the courts, made during the period of inactivity on the part of Congress on the subject now under consideration, that "where, in relation to the subject-matter, different rules may be suitable for different localities, the states may exercise powers which, though they may be said to partake of the nature of the power granted to the general government, are strictly not such, but are simply local powers which have full operation *unless* or *until circumscribed* by the *action of Congress in effectuation of the general power,*" have been placed by the courts, the real true reasoning underlying the principle is the *necessity* of conceding to the states such power. Without such power the states, in the ab-

[Southern Express Company v. The State.]

sence of congressional legislation, would not possess the authority which is necessary to the orderly conduct of their affairs, and to the due enforcement of their laws. The courts thus, by a process of wise reasoning, ingrafted upon this clause of the Constitution, out of respect to the necessity of the situation, a *double* construction, as it were, and held that where the subject of commerce is of such a nature as to require different systems of regulation, drawn from local knowledge or experience, it may be the subject of state regulation so long as Congress has not legislated, but that:

"Where the power of Congress to regulate is *exclusive,* the *failure* of Congress to make express regulations indicates its will that the subject shall be left free from any restrictions or impositions; and any regulation of the subject by the states, except in matters of local concern only, * * * is repugnant to such freedom." —*Robbins v. Shelby Taxing District,* 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694.

It was under the above rules of construction that in *Rhodes v. Iowa,* 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088, Justices Harlan, Gray, and Brown were of the opinion that, through the effect of the Wilson bill, which was construed by the court in the case of *In re Rahrer, supra,* intoxicating liquor was brought within the complete operation of the valid police jurisdiction of a state immediately upon its arrival in such state and *before* its delivery in the original package to the consignee. While, in that case, a majority of the court were of a different opinion, the opinion of the majority was based upon the language of the *act* under review, and not upon constitutional grounds. In other words, in *that* case the majority of the court determined that Congress had not *exercised,* and not that it did not *possess,* a particular power.

Intoxicating liquor is admitted by all persons to be a subject which, from knowledge and experience, requires, in all localities, some sort of regulation, and while it has been held to be a subject of interstate commerce over which the states have no authority, in the absence of congressional legislation, to deal, nevertheless the same *reasoning of necessity* which actuated the courts in ingrafting upon the commerce clause of the federal Constitution that construction which declared that "where the subject of commerce is of such a nature as to require different systems of regulation, drawn from local knowledge or experience, it may be the subject of state regulation so long as Congress has not legislated," impelled the Congress to pass the Wilson bill, and then, to meet it deficiencies, the Webb bill. The same process of reasoning which impelled the courts to ingraft upon the commerce clause of the federal Constitution the construction which we have just above quoted leads with irresistible logic to the conclusion that when, in adopting the Constitution, the people of the United States conferred upon Congress the broad powers enumerated in the commerce clause of that Constitution, they actually conferred, as a *necessary,* inherent incident of the power, sufficient authority to so regulate by laws needed for the purpose commerce between the states as to *advance* and not to *hinder* such police regulations of the state as are recognized by the federal government, through its courts, as legitimate under the federal Constitution itself, and which police regulations cover such subjects as the common experience of mankind indicates should, in the interest of sobriety, good order, and morality, be made the subject of control at the hands of all enlightened governments. While the citizens of our various states are peculiarly within the protection of their states, they are also citizens of the

United States, and when they established the federal
government and adopted its Constitution for the pur-
pose of promoting, among other things, "the general
welfare," and when, in the tenth amendment to the Con-
stitution, they declared that 'the powers not delegated
to the United States by the Constitution nor prohibited
by it to the states are reserved to the states respective-
ly or to the people," it would appear that, as they, sub-
ject to the exception which we have above indicated,
vested in Congress for legislative purposes exclusive
control over interstate commerce, they intended, *even as
against themselves and as against their own acts,* to
lodge in Congress the power to control, by direct leg-
islation, in any way it might see proper, those articles
of commerce which the common welfare, out of respect
to a healthy morality among all the people, demands
shall be made the subjects of a not unrestricted com-
merce among the states. Indeed, it can hardly be con-
tended that the power to which we refer is among the
reserved rights of the people, for when the Constitution
of the United States was adopted each of our states pos-
sessed a representative form of government. In matters
of legislation the people of each state acted, not directly,
but through their representatives. Each state, as a
state, then possessed *absolute legislative control* over
the subject of commerce. The *people* of each state had
*lodged* that power in the *legislative body* of the state,
and that power still remains with the legislative body of
the state subject to the limitations imposed by the state
and the federal Constitutions, and all power on that
subject which does not belong to the state belongs now
to the federal government, subject, of course, to the ex-
pressed and implied limitations upon that power con-
tained in the federal Consttiution.—*Gibbons v. Ogden,
supra.*

In the practical application of the principles grow-
ing out of the exclusive power of the federal govern-
ment to regulate commerce among the states, it has not
infrequently occurred that, owing to different police reg-
ulations in different states, articles which, under cer-
tain conditions, might be shipped into one state could
not, under the same conditions, be shipped into some
other state. A shipment into the state of Idaho of cat-
tle suffering from *Texas fever* might, at periods, be un-
lawful because of a police regulation of that state pro-
hibiting such importation at such periods; while a sim-
ilar shipment into the state of Alabama, because of the
absence of such police regulation in the latter state,
might be lawful.—*Railroad Co. v. Husen, supra; Ras-
mussen v. Idaho,* 181 U. S. 198, 21 Sup. Ct. 594, 45 L.
Ed. 820. We refer to this simply for the purpose of il-
lustrating our views that the mere fact that, under the
Webb law, liquor may be shipped with but few restric-
tions into some states while it cannot be shipped into
other states except under rigid restrictions, presents no
obstacle to the operation of that law within the real pur-
pose of the people when they conferred upon Congress,
subject only to the limitations imposed by the Constitu-
tion itself, exclusive control of interstate commerce. Un-
der the powers possessed by the states they may so reg-
ulate intrastate commerce as to meet the reasonable and
wise police regulations of their counties, and Congress
must possess, under the commerce clause of the federal
Constitution, in order that it may meet the growing de-
mands and ever-increasing needs of the people of the na-
tion, a similar power with reference to the reasonable
and wise police regulations of the states. No state can,
by any law contravene, directly or indirectly, the Con-
stitution of the United States. The laws of the state
must, in all things, harmonize with the purposes of the

people as they have given expression to those purposes in that Constitution. This being true, we can see no reason why Congress cannot, if it sees proper to exercise the power, so regulate, by statute, interstate commerce as to meet the needs of each of our states as those needs find expression in the valid police regulations of each particular state.

"All experience shows that the same measures, or *measures scarcely distinguishable* from each other, may flow from distinct powers; but this does not prove that the powers themselves are identical. Although the means used in their execution may sometimes approach each other so nearly as to be confounded, there are other situations in which they are sufficiently distinct, to establish their individuality."—*Gibbons v. Ogden, supra.*

In so far as the instant case is concerned, the Webb law, in aid of the public policy of our state, has cut from interstate commerce, in so far as this state is concerned, an article intended for use in the state in violation of a statute which this state, under both the federal and state Constitutions, had the power to enact. In other words, Congress, in whom the people have expressly vested the exclusive power to legislate upon the particular subject, has, "in that spirit of harmony and conciliation which ought always to characterize the conduct of governments standing in the relation which that of the Union and those of the states bear to each other," "in some measure, adapted its own legislation to this object, by making provisions in aid of those of the states."—*Gibbons v. Ogden, supra.*

"Although Congress cannot enable a state to legislate Congress may adopt the provisions of a state on any subject."—*Gibbons v. Ogden, supra.*

And in adopting the Webb law Congress has simply come to the rescue of prohibition and local option states

against meretricious importations into such states of intoxicating liquors intended for use therein in violation of their laws. The commerce clause of the Constitution was not adopted by the people for the purpose of enabling Congress, by inactivity, to place the subject of interstate commerce within the unbridled license of shippers of all characters of commodities. It was placed in Congress in trust that it would, as the growing commerce and the constantly changing conditions attendant upon a great and busy nation might demand it, so legislate upon, and by such legislation so regulate our interstate commerce by laws of equal and just application, as to best subserve the welfare of all of our people.

"The 'power to regulate commerce' here meant to be granted was that power to regulate commerce which previously existed in the states. But what was that power? The states were unquestionably supreme; and each possessed that power over commerce which is acknowledged to reside in every sovereign state. * * * The law of nations, regarding man as a social animal, pronounces all commerce legitimate in a state of peace until prohibited by positive statute. The power of a sovereign state over commerce, therefore, amounts to nothing more than a power to limit and restrain it at pleasure."—*Gibbons v. Ogden, supra.*

While the federal government, under the Constitution as originally adopted and the various amendments which have been added to it since its adoption, has not an unbridled power over interstate commerce, the above excerpt from *Gibbons v. Ogden* is authority for the statement that Congress under the federal Constitution possesses all the power over interstate commerce which this state under the federal and state Constitutions possesses over its intrastate commerce. When, in *Gibbons v. Ogden,* the Supreme Court of the United States, in

construing this clause of the federal Constitution, declared that the Constitution should not be held to "that narrow construction which would cripple the government and render it unequal to the obejcts for which it is declared to be instituted, and to which the powers given, as fairly understood, render it competent," that court realized that there must be given some flexibility to the practical operation of the law itself, and that a Constitution is to be so interpreted as to carry out the great principles of the government, not to defeat them. —*Hamilton v. St. Louis Co.*, 15 Mo. 3; *State v. McCarty*, 5 Ala. App. 212, 59 South. 543.

While intoxicating liquor is property and an object of constant commerce, it is, as we have already said, an article which is made the subject of some kind of police regulation in every state of the Union. These police regulations are not, it is true, uniform in the various states, but all the states have them. There is therefore a field for the operation of the Webb law in every state of the Union; and, if the federal Constitution, under which this government was established, and which, to use the language of the Supreme Court of the United States in the *Legal Tender Cases*, 110 U. S. 421, 14 Sup. Ct. 122, 28 L. Ed. 204, was "intended to endure for ages and to be adapted to the various crises of human affairs, and is not to be interpreted with the strictness of a private contract," then it would seem that, in adopting the Webb bill Congress was exercising, not an *implied,* but an *express,* power conferred upon it by the Constitution.

"If any one proposition could command the universal assent of mankind, we might expect it would be this: That the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result, necessarily, from its nature. It is the government of all; its powers are delegated by all; it

represents all, and acts for all.   *   *   *   We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the national Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."—*McCulloch v. Maryland,* 4 Wheat. 316, 4 L. Ed. 579. Miller on the Constitution, pp. 142, 143.

While there has always been a difference of opinion as to whether the federal Constitution should receive a liberal or a strict construction, this difference of opinion has been more distinctly pronounced with reference to the *implied,* rather than with reference to the *express,* grants of power by the Constitution. Where the power is *expressly* granted, there has been but little room for debate, and it must be remembered that the inability of the confederated states to regulate commerce with foreign nations with the states, and with the Indian tribes, was one of the principal defects in the Articles of Confederation, which finally led to the adoption of the federal Constitution.—Tucker on the Constitution, p. 520, § 251. In other words, before the adoption of the Constitution the common welfare of the states demanded that there should exist, subject to the limitations imposed by the Constitution, in one body, that exclusive, autocratic power over foreign and interstate commerce which naturally and inherently belongs to all independ-

ent and well-regulated government.   It was this condi-
tion which led to the adoption by the states of the com-
merce clause of the federal Constitution.   While, in its
adoption, it was, in so far as interstate commerce is con-
cerned, the purpose to "remove the trammels upon trans-
portation between different states and to prevent such
trammels in the future," in other words, while the pur-
pose was to facilitate commerce and to secure to the
people "equality and freedom in commercial intercourse
against discriminating state legislation" (*Railroad Co.
v. Richmond, et al.,* 19 Wall. 584, 22 L. Ed. 713), the
reasoning of the Supreme Court of the United States in
*Gibbons v. Ogden, supra,* in which the opinion was writ-
ten by Chief Justice MARSHALL, and in *Re Rahrer, su-
pra,* in which the opinion was written by Chief Justice
FULLER, clearly irresistibly leads to the conclusion that
Congress may under the commerce clause of the Consti-
tution, so regulate interstate commerce as to aid the
states in the enforcement of such reasonable police reg-
ulations as they, under the federal and state Constitu-
tions, may adopt.   Indeed, a careful analysis of the de-
cisions of the Supreme Court of the United States—the
only court that has the power to speak authoritatively
on this subject—convinces us that the misconceptions
as to what that court meant in some of its decisions in
referring to the clause of the Constitution now under
consideration are due to the fact that Congress has, in
a large measure, remained *inactive;* has not seen proper
to exercise, by legislation, the full power which in fact
it possesses, and that for this reason interstate com-
merce has, up to the present time, been permitted large-
ly to remain where the Constitution, unaided by con-
gressional legislation, has placed it.   A careful compari-
son of the opinions of the court in the cases of *Gibbons
v. Ogden, supra, Railroad Company v. Richmond, et al.,*

*supra, Brown v. Maryland,* 12 Wheat. 419, 6 L. Ed. 678, *Bowman v. Chicago, etc., Railway Co.,* 125 U. S. 465, 8 Sup. Ct. 689, 1062, 29 L. Ed. 502, and *In re Rahrer, supra,* will demonstrate the correctness of this statement. In other words, in many of the cases the courts, in passing upon questions growing out of the commerce clause of the federal Constitution, having no act of Congress to deal with, because of the *inactivity* of Congress on the particular subject, have dealt, *not with the power of Congress to make a particular law,* but with the power of some state, to make a particular law.—*Bowman v. Chicago, etc., Railway Co., supra; Kidd v. Pearson,* 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 456; *Vance v. Vandercook,* 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100; *Rhodes v. Iowa,* 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088. In the case of *Gibbons v. Ogden, supra,* the Supreme Court, however, in plain and comprehensive terms, illustrates the broad powers of Congress under the clause in question, and in the case of *In re Rahrer, supra,* the same court, in terms of equal strength and comprehensiveness, directly addresses itself to the consideration of the power of Congress, by a particular act, passed for the purpose of defending the police regulations of the states, to place limitations upon certain articles of interstate commerce.

Giving to the clause under consideration, not that narrow construction which would render Congress unable to meet the reasonable demands of the police regulations of the states with reference to a subject which every one recognizes should receive constant and watchful regulation, but giving to it that construction which "the words of the grant, as usually understood, import, and which is consistent with the general views and objects of the instrument," it seems to us that, in enacting the Webb law, Congress exercised a constitutional

power which was lodged in it for the purpose of defending reasonable police regulations of the state.

"Every form of government unavoidably includes a grant of some discretionary powers. It would be wholly imbecile without them. It is impossible to foresee all the exigencies which may arise in the progress of events connected with the rights, duties, and operations of a government. If they could be foreseen, it would be impossible ab ante to provide for them. The means must be subject to perpetual modification and change; they must be adapted to the existing manners, habits, and institutions of society, which are never stationary; to the pressure of dangers or necessities; to the ends in view; to general and permanent operations, as well as to fugitive and extraordinary emergencies. In short, if the whole society is not to be revolutionized at every critical period, and remodeled in every generation, there must be left to those who administer the government a very large mass of discretionary powers, capable of greater or less actual expansion, according to circumstances, and sufficiently flexible not to involve the nation in utter destruction from the rigid limitations imposed upon it by an improvident jealousy. Every power, however limited, as well as broad, is in its own nature susceptible of abuse. No Constitution can provide perfect guards against it. Confidence must be reposed somewhere, and in free governments the ordinary securities against the abuse are found in the responsibility of rulers to the people, and in the just exercise of their elective franchise, and ultimately in the sovereign power of change belonging to them in cases requiring extraordinary remedies."—1 Story, Const. p. 324, § 425.

Indeed, if Congress possesses the power to authorize a state, in the exercise of its police power, to confiscate *immediately* upon its delivery to the consignee, intox-

icating liquors *intended to be sold,* in violation of the laws of such state, *in the original packages,* a power which, in *Vance v. W. A. Vandercook Co.,* 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100, it was declared to possess, we can see no reason why it cannot, with equal propriety and upon the same reasoning, be held to possess the power to vest in a state, under its police power, the right to confiscate such liquors *before* delivery to the consignee. The argument was, until the Supreme Court in the case of *In re Rahrer,* settled the question, that a sale by the consignee was an incident of interstate commerce; that the purpose of the people in adopting the commerce clause of the federal Constitution was to facilitate *trade,* and that to inhibit such a sale would be to destroy the prime object of the people in adopting the clause. The theory that Congress did not possess the power was, however, as we have already said, exploded, and we can see no reason why a common carrier in possession of contraband liquors should be held to possess any higher claim upon the protective feature of the commerce clause of the Constitution than a consignee while in possession of the original package. Protection is furnished the carrier in order that, through him, the legitimate subjects of commerce may find protection until they are delivered to the consignees. In legal contemplation a consignee finds no protection if, *immediately* upon the receipt of his goods, they are in their original packages subject to confiscation at the hands of a state. In legal contemplation he is no better off than he would have been had the goods never reached his hands. So far as he is concerned, the goods might as well have been confiscated in the hands of the carrier, or as to that matter, he is, in legal contemplation, in the same condition as if they had never been accepted by the carrier. We say, *in legal contemplation* because

as a practical matter a receipt by a consignee of contra-
band articles in original packages frequently enables
him to evade the law and illegally use such packages.
The true legal reasons, however, which sustain the Wil-
son bill also sustain the Webb bill; and, while the Webb
bill may, in its practical operation, create some incon-
venience to carriers engaged in interstate commerce,
these inconveniences grow out of a statute which Con-
gress has seen proper to adopt because of a call of the
people of the states for congressional activity on a sub-
ject over which, through express grant of the people,
Congress has exclusive control. The power to control
includes the power to limit. Congress, in the Webb law,
has simply placed a limitation upon commerce in so far
as intoxicating liquors are concerned, and as a part of
such limitation requires common carriers to refuse to
accept for transportation, or to deliver to the consignee,
that which "is forbidden commerce."—*Gibbons v. Og-
den, supra.* Liquor intended for unlawful use in this
state is not an article of interstate commerce, and is
therefore within the jurisdiction of our laws, not be-
cause an act of the Legislature of Alabama has for-
bidden it to interstate commerce, but because an act of
Congress has forbidden it to interstate commerce.—
*State v. McCarty,* 5 Ala. App. 212, 59 South. 543.

(6) We have already called attention to our statute
which requires that our prohibitory laws shall be so con-
strued as to avoid conflict with the interstate commerce
clause of the federal Constitution. We have also call-
ed attention to that provision of our laws which declares
that: "The keeping of liquors or beverages that are
prohibited by the laws of the state to be manufactured,
sold, etc., in any building not used exclusively for a
dwelling shall be, prima facie evidence that they are

kept for sale, or with the intent to sell the same, contrary to law."

As common carriers engaged in interstate commerce are not prohibited by the federal laws from bringing into this state all intoxicating liquors, but only such as are intended for unlawful use in this state, the above-quoted provision of the Fuller bill is not applicable to common carriers engaged in interstate commerce. Plainly this provision of the Fuller bill was not, when it was passed, intended to apply to common carriers engaged in interstate commerce, and there is nothing in the Webb bill bringing such carriers within the operation of said quoted section of the Fuller bill. In so far as this state is concerned, its laws have no effect upon liquors brought into this state from another state unless, in contravention of the act of Congress, the carrier has them in its possession for the purpose of delivery or undertakes to deliver them for illegal use in the state. The laws of this state have no extraterritorial force, and the Webb bill was not intended to give to our laws any such force. The state of Alabama has nothing to do with sales that may be made in another state. It is, however, interested in the question as to whether a carrier of interstate commerce shall deliver to a consignee in this state an article which such consignee intends to use in this state in violation of a valid state law. The true, legal effect of the Webb bill, construed in connection with our prohibitory statutes, is to prohibit a carrier engaged in interstate commerce from delivering or having in its possession, for the purposes of delivery to a consignee, liquor which has come into its hands, and which such consignee intends to use in violation of our laws. If liquor intended for unlawful use in Alabama is delivered by the carrier to the person so intending to use it, the act of delivery at once becomes an efficient aid to the crim-

inal in his intended violation of the law.　The act of Congress prohibits the acceptance by a carrier at any point of liquors sought to be shipped to any other point and intended for illegal use at that point; but as liquor, so long as it remains in the actual custody of the carrier, is harmless, this state has no concern with it until it reaches the point of delivery.　When it gets there, then, if the carrier delivers it to the consignee, or keeps it in its possession for the purpose of delivering it to the consignee, knowing that the consignee intends to use it in violation of the law, such carrier violates both the letter and the spirit of the laws of the state and of the act of Congress.　*These* are the acts of the common carrier of which this state has a right to complain, and these are the acts which, under the Webb bill, are brought within the operation of the prohibitory laws of our state.　So interpreted, the doctrine of uniformity of regulations is not violated by the Webb bill and, to use the language of the Supreme Court in *Rhodes v. Iowa, supra,* the Webb bill should be interpreted and enforced by the light of the fundamental rule of carrying out its purpose and object, of affording the remedy which it was intended to create, and of defeating the wrong which it was intended to frustrate.　When, therefore, a common carrier in this state is possessed of liquors for delivery to a person who intends to use it in violation of the law, or when, in this state, a common carrier delivers liquor to a person in this state who intends to put it to an illegal purpose, such common carrier itself violates the law of the state and becomes amenable to the state laws for such violation, unless, indeed it is without knowledge as to the unlawful purposes of the consignee.　Since the passage of the Webb law the citizen who buys liquor in another state for his own use in this state and the illicit liquor seller who

makes a similar purchase for illegal purposes in this state do not occupy the same position as to protection under the interstate commerce law.

"The commerce clause of the federal Constitution does not now afford to the carrier the complete protection it formerly did. The carrier must now, if it wishes to avoid being prosecuted, take notice of the use to which it is intended to put the liquor, and, if the use will violate the law of the state at the place of delivery, the carrier may refuse to receive the shipment or, having received it, may refuse to deliver it."—*Adams Express Co. v. Commonwealth of Kentucky,* 154 Ky. 462, 157 S. W. 908, 48 L. R. A. (N. S.) 342.

Under section 240 of the federal Penal Code interstate shipments of intoxicating liquors, etc., are prohibited unless each package containing the same "be so labeled on the outside cover as to plainly show the name of the consignee, the nature of its contents, and the quantity contained therein." Under the provisions of this section of the Penal Code a common carrier of interstate commerce is therefore apprised, when intoxicating liquor is received by it for shipment, of that fact, and, since the passage of the Webb law, before it delivers such liquor to the consignee in this state it should inform itself as to the purpose of the consignee with reference to the liquor. If it has liquor in its possession in this state for delivery to a person who intends to use it in violation of the law, or actually delivers it in this state to such person, then, presumptively, it has itself been guilty of a violation of the law.

"When an act denounced by the law is proved to have been committed, in the absence of countervailing evidence, the criminal intent is inferred from the commission of the act."—*Gordon v. State,* 52 Ala. 308, 23 Am. Rep. 575; *Tinker v. State, supra.*

(7) The bill in this case alleges that the defendant, Southern Express Company, has, in Morgan county, Ala., depots, warehouses, or storage places where goods are stored or kept from the time they are received in Morgan county until they are delivered to their consignees in said county; that "prohibited liquors are received at said warehouses or storage places in large quantities and at frequent intervals to be delivered to individuals for illegal purposes, and that it is received by defendant for distribution or delivery, contrary to the laws of the state of Alabama, and that it is maintaining a common nuisance or liquor nuisance in violation of law." The bill therefore plainly charges a violation by the defendant of the law, and shows a situation which authorizes injunctive relief.—Gen. & Local Acts, Sp. Sess., 1907, pp. 71, 72, 73. The words, "prohibited liquors," used in the above quotation mean intoxicating liquors which, under the law, the defendant has not the legal right to have in its possession, and if it be true that the defendant, as charged in the bill, is in the habit of receiving and storing in its warehouses and storage places intoxicating liquors for the purpose of delivering them to consignees for illegal uses, then, under the terms of the Webb law, the defendant cannot claim protection against such illegal acts as a carrier of interstate commerce.

The court below committed no error in overruling the defendant's demurrer to the bill, and, under the facts stated in the bill, he had authority to grant the preliminary writ of injunction.

(8) In our opinion, however the court should have granted the defendant's motion to dissolve the preliminary writ of injunction. If, in good faith, and after proper investigation, a common carrier of interstate commerce delivers liquors to a consignee without any

knowledge on its part that such liquors are intended by the consignee for illegal use, then such common carrier cannot, we think, be held to have violated any law of this state. The defendant's answer is sworn to, and while, in its answer, and as a part of its defense, it pleads the unconstitutionality of the Webb bill, in its answer it expressly negatives the charges in the bill of complaint that it is, in any way, acting in violation of any of the laws of this state. The answer is sworn to, and, "to justify a departure from the rule that an injunction should be dissolved on a sworn answer denying the averments of the bill, it must be apparent that irreparable mischief will follow, or some circumstance peculiar in its character must exist to justify a departure from it."—*Satterfield v. John,* 53 Ala. 127; *Johnson, et al. v. Howze, et al.,* 154 Ala. 496, 45 South. 653; *Long v. Shepherd,* 159 Ala. 595, 48 South. 675; *Weeks v. Bynum,* 158 Ala. 231, 48 South. 489.

(9) The above being our conclusions, the decree of the court below refusing to dissolve the preliminary injunction is hereby reversed, and a decree is here rendered dissolving said injunction, and the cause is remanded for further proceedings in the court below.

Reversed, rendered, and remanded. All the Justices concur.