## Commonwealth v. White.

(Decided November 4, 1915.)

### Appeal from Warren Circuit Court.

1. Commerce—Carriers—Interstate Commerce.—The Mann-Elkins Act of Congress, passed June 18th, 1910, making it unlawful for a common carrier of interstate commerce to disclose, without the consent of the shipper or consignee, any information concerning property delivered to such common carrier for interstate transportation, was designed for the protection of interstate commerce, and was an extension of the original Interstate Commerce Act of 1887.

2. Intoxicating Liquors—Shipment—Kentucky Statutes, Section 2569b.—The Mann-Elkins Act, passed by Congress on June 18th 1910, applies only to interstate shipments; the Kentucky Act of 1914 (Carroll's Statute 1915, section 2569b, sub-section 3), making it lawful for a common carrier within this State to carry intoxicating liquors from a point within the State where intoxicating liquors may be lawfully sold, to another point within the State

where intoxicating liquors may not lawfully be sold, under the conditions prescribed by said statute, applies to intrastate shipments only.

3. Intoxicating Liquors—Webb-Kenyon Act—Effect of.—The federal law, known as the Webb-Kenyon Act, approved March 1, 1913, had the effect of withdrawing interstate shipments of liquor from the protection afforded to interstate shipments by the Federal Constitution, and made them subject to the State law, in case such interstate shipments were intended, by any person interested therein, to be received, possessed, sold, or in any manner used in violation of any law of the State.

4. Intoxicating Liquors—Webb-Kenyon Act.—Before the passage of the Webb-Kenyon Act by Congress in 1913, all interstate shipments were under the protection of the commerce clause of the Federal Constitution, and they must so remain except to the extent that they have been taken out of that protection by the Webb-Kenyon law; and, since that law specifies the character of the shipment designed to be taken from under the protecting clause to be liquors intended to be received, possessed, sold, or in any manner used in violation of any law of a State, it was manifestly not the intention of Congress to remove this protection from any other character of shipment.

5. Intoxicating Liquors—Webb-Kenyon Act.—It is not unlawful for one to buy, where it is lawful to sell it, intoxicating liquor for his own use, and bring it into Kentucky, or to have liquor so purchased in his possession, for such use; and, to such a case the Webb-Kenyon Act has no application.

6. Intoxicating Liquors—Interstate Shipment.—In the absence of proof that an interstate shipment of intoxicating liquor into Kentucky is of that character which is forbidden by the laws of this State, it will be presumed that the shipment was lawful; and not being intended to be received, possessed, sold, or in some manner used in violation of the law of Kentucky, the Webb-Kenyon Act has no application; and the carrier who refused to exhibit to a stranger his book of interstate shipments, kept under the Act of 1914, did not violate that law.

G. DUNCAN MILLIKEN, JOHN B. GRIDER and JAMES GARNETT, Attorney General, for appellant.

MAXWELL & RAMSEY, JOSEPH GRAYDON and SIMS, RODES & SIMS for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER—Affirming.

The appellee, J. M. White, was tried and acquitted of the offense of unlawfully refusing, neglecting and failing to keep open to public inspection during business hours of the Adams Express Company, in Bowling Green,

Kentucky, the book of that company in which was kept
a record of all shipments of intoxicating liquors shipped
into Warren County, within which territory the sale of
intoxicating liquors for beverage purposes was prohibited
by law.

Under the stipulation of facts, it appeared that the
company maintained a local office in the city of Bowling
Green, and that in said city the sale of intoxicating liquors
for beverage purposes was prohibited by law; that the
appellee White was the local agent, at Bowling Green,
of the Adams Express Company, and the manager of its
local office; that in said local office White, as agent and
manager, kept two separate books, in which were entered
immediately upon receipt thereof, truthful statements
of the quantity and kind of liquors received, with the
name and address of the consignor, and the name and
address of the consignee; the purpose for which said
liquor was intended to be used as stated on the outside
of the package containing such liquor; the date when re-
ceived, and the date when delivered, and by whom and to
whom delivered, and with a blank space in said book in
which the consignee, by himself or agent, was required to
sign his true name, before said liquor was delivered to
him or his agent; and that said book was open to public
inspection during the business hours of said company.

It was further stipulated that only shipments of
liquor from points within the State of Kentucky to the
city of Bowling Green were entered in one of the books
and in the manner above referred to; and that no inter-
state shipments of liquor, that is to say, no shipments of
liquor by the company from places without the State of
Kentucky into the State of Kentucky, and consigned to
persons or consignees at Bowling Green, were entered in
the book of intrastate shipments; but that the company
kept another and different book which showed all such
interstate shipments of liquor from places without the
State of Kentucky to Bowling Green, showing, in sub-
stance, the quantity and kind of said liquor; the name
and address of the consignor; the name and address of the
consignee; the fact whether or not the package containing
said liquor was marked for the personal use solely of
the consignee; the date when received and delivered, and
by whom and to whom delivered, as well as a receipt from
the person to whom the same was delivered; and the last
named book of interstate shipments was not open to pub-

lic inspection at any time, except in response to legal process issued under the authority of any State or federal court, or to any officer or agent of the federal government, or of any State or territory, in the exercise of his powers, or to any official or other duly authorized person seeking such information for the prosecution of persons charged with, or suspected of crime; and, that many competing dealers, by wholesale and retail, in intoxicating liquors, shipped their goods from places without the State of Kentucky to persons at or in the city of Bowling Green.

It was further stipulated that on the day in question E. H. Porter, a private citizen of Bowling Green, holding no official position, entered the local office of the Adams Express Company and requested of White, its agent, to be shown the record of interstate shipments of intoxicating liquors, above described, showing the shipments of liquors from places without the State of Kentucky consigned to persons at or in the city of Bowling Green, Kentucky; that Porter's request was refused by White, as agent, and the record of interstate shipments was not shown to Porter; and that White, as agent at the time, expressly relied upon, and still relies upon, the provision of the Act of Congress entitled, "An Act to Regulate Commerce," approved February 4th, 1887, together with the amendment thereto, known as the Mann-Elkins Act, passed June 18th, 1910, and entitled, "An Act to Create Commerce Court, and amending the Act entitled 'An Act to Regulate Commerce,' approved February 4th, 1887, as theretofore amended, and for other purposes." He relied particularly upon that provision of the Mann-Elkins Act which provides that it shall be unlawful for any common carrier, subject to the provisions thereof, or any agent of such carrier, knowingly to disclose to any person other than the shipper or consignee, any information concerning the nature, kind, quality, destination, consignee, or routing of any property tendered or delivered to such carrier for interstate transportation, which inspection might be used to the detriment or prejudice of such shipper or consignee, or which might improperly disclose his business transactions to a competitor, under penalty of a fine of not more than $1,000.00.

The warrant was issued under the authority of section 3 of chapter 7 of the act of the Kentucky Legislature, approved March 9th, 1914, which reads as follows:

"All railroad, express or other transportation companies within this State, within the State, or doing business within this State, are hereby required to keep at each local office in territory within which the sale of intoxicating liquors for beverage purposes is prohibited by any law, a separate book, in which shall be entered immediately upon receipt thereof, truthful statements of the amount and kind of liquor received, the name and address of the consignor, the name and address of the consignee, the purpose for which said liquor is intended to be used, as stated upon the outside of the package containing such liquor; the date when received, the date when delivered, and by whom and to whom delivered; after which record shall be a blank space in which the consignee, by himself or agent, shall be required to sign his true name before such liquors are delivered to such consignee or his agent, which book shall be open to public inspection at any time during the business hours of said company. Such book shall constitute *prima facie* evidence as to the facts therein stated, and be admissible as evidence in any court in this State. Any railroad, express or other transportation company, or any employe or agent thereof who fails, neglects, or refuses to comply with the provisions of this section, or who makes, or causes to be made, any false entry in said book, shall be deemed guilty of a misdemeanor, and for each offense shall be punished by a fine of not less than fifty dollars, nor more than two hundred dollars, or imprisoned in the county jail not less than thirty days nor more than six months, or both such fine and imprisonment, in the discretion of the jury." Acts 1914, p. 27; Carroll's Statutes (1915), sec. 2569b, sub-section 3.

The Mann-Elkins Law, passed June 18th, 1910, as an amendment to the Interstate Commerce Act of 1887, provides, in part, as follows:

"It shall be unlawful for any common carrier subject to the provision of this act, or any officer, agent or employee of such common carrier, or for any other person or corporation lawfully authorized by such common carrier, to receive information therefrom, knowingly to disclose to or permit to be acquired by any person or corporatin other than the shipper or consignee, without the consent of such shipper or consignee, any information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to such

common carrier for interstate transportation, which information may be used to the detriment or prejudice of such shipper or consignee, or which may disclose his business transactions to a competitor, etc.''

That act further provides that any information of the character above described, may be obtained by any officer or agent of the government of the United States, or of any State, in response to any legal process, and imposes a penalty of not more than $1,000.00 for a violation thereof.

Unquestionably, the Mann-Elkins Law was designed for the protection of interstate commerce, and was an extension of the original Interstate Commerce Act of 1887. Under the operation of the original act of 1887, it was found that great abuses existed, and to prevent those abuses and to protect shippers from the injury resulting from the improper acts of the common carrier in disclosing information as to the transactions of shippers to their competitors, the amendment above referred to was enacted.

The federal act, however, could apply only to interstate shipments; and, by its terms, it does not pretend to control intrastate shipments. On the other hand, the Kentucky statute of 1914, *supra*, under which this prosecution arose, applies to intrastate shipments and could not affect interstate shipments, unless the federal law, approved March 1st, 1913, known as the Webb-Kenyon Act, had the effect of withdrawing interstate shipments of liquor from the protection afforded to interstate shipments by the federal constitution, and made them subject to the State laws.

The Webb-Kenyon Law reads as follows:

''An Act divesting intoxicating liquors of their interstate character in certain cases.

''Be it enacted, etc., that the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one state, territory, or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, into any other State, territory, or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, or from any foreign country into any state, territory or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, which said spiritu-

ous, vinous, malted, fermented, or other intoxicating liquor is intended by any person interested therein to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such state, territory, or district of the United States, or place non-contiguous to but subject to the jurisdiction thereof, is hereby prohibited.''

It will be observed that by this express provision of the Webb-Kenyon Law, only such interstate shipments are thereby prohibited as are ''intended by any person interested therein, to be received, possessed, sold, or in any manner used in violation of any law of such State.''

The Webb-Kenyon Law puts beyond the protection afforded interstate commerce any intoxicating liquor shipped into the State to be sold or in any manner used, in violation of a law of this State. Palmer v. Express Co., 129 Tenn., 116; State v. Doe, 92 Kan., 212; State v. Express Co. (Iowa), 145 N. W., 451; U. S. v. Oregon-Washington R. & N. Co., 210 Fed., 378; Van Winkle v. State (Del.), 91 Atl., 385; Ex Parte Peede (Tex.), 170 S. W., 749; Southern Express Co. v. State (Ala.), 66 South, 115; State of West Virginia v. Adams Express Co., 219 Fed., 802.

Before the passage of the Webb-Kenyon Law, all interstate shipments were under the protection of the commerce clause of the federal constitution, and they must so remain except to the extent they have been taken out of that protection by the Webb-Kenyon Law; and, since that law specifies the character of the shipment designed to be taken from under the protecting clause, to-wit, liquors intended to be received, possessed, sold, or in any manner used in violation of any law of a State, it was manifestly not the intention of Congress to remove this protection from any other character of shipment.

The question, therefore, for decision in the case under consideration is, whether intoxicating liquors shipped from points outside of the State of Kentucky and received at Bowling Green, Kentucky, and concerning which the record in question was kept, were, by the operation of the Webb-Kenyon Law, divested of the protection afforded to interstate shipments by the Federal Constitution.

Obviously, such shipments are not divested of that protection, unless they are intended to be received, pos-

sessed, sold, or in some manner used in violation of a State law.

But all shipments of intoxicating liquors into Kentucky are not prohibited by law. It is not unlawful for one to buy, where it is lawful to sell it, intoxicating liquor for his own use and bring it into Kentucky, or to have liquor so purchased in his possession, for such use. Adams Express Co. v. Commonwealth, 154 Ky., 471, 48 L. R. A. (N. S.), 342.

In the case last above cited we said: "The result of our views on the whole case is, that whether a carrier of an interstate shipment of liquor subjects itself to punishment or not, depends on the use to which the person to whom it delivers liquor intends to put it. If this use violates a law of the State, then the carrier may be punished; if it does not, the carrier has not committed any offense.

"A further result is that the guilt or innocence of the carrier becomes in each case a question of fact to be determined as are other disputed issues of fact under our law."

See also Adams Express Co. v. Commonwealth, 160 Ky., 66; and Adams Express Co. v. Kentucky, 238 U. S., ——, decided June 14, 1915.

The protection of the commerce clause still attaches to all lawful interstate shipments of liquor; and, to bring the transaction involved in this controversy within the operation of the Webb-Kenyon Law, and divest it of the protection of the commerce clause of the Constitution, the court would have to presume, without proof, that the book which Porter requested to see contained a record of shipments of liquor intended to be received, possessed, sold, or in some manner used in violation of the law of Kentucky. But, under well established principles of law, the contrary presumption must prevail in the absence of proof, and there is no proof here as to the character of the shipment. The carrier must take notice of the use for which the liquor is intended, and if this use will violate the law of the State at the place of delivery, it may refuse to accept the shipment, or, having received it, may refuse to deliver it. But, as above stated, in the absence of proof upon the subject, it must be presumed that the carrier did not violate the State law, and consequently that the record in question is a record of shipments of liquors for lawful purposes.

It follows, therefore, under the record before us, that the shipments in question must be treated as if they were lawful, and, consequently, fully invested with the protection afforded to interstate commerce by the commerce clause of the Constitution; and, that the agent of the express company could not lawfully disclose, to a private citizen, any information concerning said shipments, except with the consent of the consignor and the consignee.

Judgment affirmed.