# Southern Express Co. *v.* Whittle.

*Bill to Compel the Reception and Transporting of Liquors.*

(Decided June 17, 1915.   Rehearing denied July 2, 1915.
69 South. 652.)

1. *Commerce; Interstate; Power of Congress.*—The power of Congress to regulate interstate commerce, includes the power to declare what shall be interstate commerce, and it may distinguish between things deleterious and things beneficial or innocuous and deny absolute or conditional entrance into interstate commerce things which are deleterious; hence, the provisions of the Webb-Kenyon law were within the power of Congress to enact.

2. *Same; Intoxicating Liquors.*—The Webb-Kenyon law divests intoxicating liquors of their character with reference to interstate commerce in the cases contemplated and described in the act, and in such cases such liquors can only be regarded, when transported from one state to another, as if the Federal Constitution had not contained the commerce clause, and so construed the act as not invalid as delegating Federal authority to the states.

3. *Same.*—The Webb-Kenyon law prohibits intoxicating liquors from entering into interstate commerce where the purpose is unlawful under valid state statutes, and any valid exercise of the police power of the state is not an attempted regulation of interstate commerce.

4. *Constitutional Law; Police Power.*—Sections 1 and 35, Constitution 1901, do not restrict the rightful exercise of the police powers of the state; and the legislature may ascertain when the welfare of

the people requires the exercise of the police power as well as what are appropriate measures to that end, subject only to the right of the court to see that the measures do not arbitrarily violate constitutional rights.

5. *Same; Intoxicating Liquors.*—Acts 1915, p. 44, section 12, (known as the Bonner law) is a valid exercise of the police power, and does not conflict with either sections 1 or 35 of the Constitution of Alabama, nor with the Fourteenth Amendment to the Constitution of the United States.

6. *Intoxicating Liquors; Statutes; Validity.*—Section 13, Acts 1915, p. 45, is valid.

APPEAL from Montgomery City Court.

Heard before Hon. GASTON GUNTER.

Bill by J. E. Whittle against the Southern Express Company to compel it to receive and transport from Pensacola, Florida, to Ramer, Alabama, a shipment of intoxicating liquors. From a decree granting a mandatory injunction, respondent appeals. Reversed and rendered, and the bill dismissed.

W. L. MARTIN, Attorney General, SAMUEL D. WEAKLEY and LINDSAY ROGERS, for appellant.

WEIL, STAKELY & VARDAMAN, and LAWRENCE MAXWELL, for appellee.

McCLELLAN, J.—The complainant, Whittle, filed this bill against the Southern Express Company to compel it to receive at and transport from Pensacola, Fla., to Ramer, Ala., a shipment of intoxicating liquors, viz., whisky, consisting of six quarts. Whittle was and is engaged in the liquor business in Pensacola, and, having received an order, accompanied by the requisite cash price, from Fletcher Farmer, who resides at Ramer, Ala., and who was one of Whittle's customers, for the six quarts of whisky mentioned, tendered the shipment to the common carrier at Pensacola, Fla., for transportation to the consignee at Ramer, Ala. The carrier re-

fused to accept the shipment of six quarts of whisky, assigning as the only reason for its refusal thereof that the law of Alabama forbade the carrier's transportation and delivery to one consignee at a point in "dry territory" in the state of Alabama of more than one gallon of whisky in any four consecutive weeks, even though the shipment is tendered in another state for transportation and delivery to a consignee in "dry territory" in the state of Alabama. Ramer, where the carrier has an office, is in "dry territory" in the state of Alabama. It is conceded, as upon the averments of the bill, that the shipment of whisky, tendered to the carrier as stated, was only intended for the personal use of Farmer (consignee), and for the use of his family, and not otherwise. The carrier's refusal was based upon an enactment commonly called the "Bonner Anti-Shipping Bill," which became effective in Alabama on February 8, 1915, entitled, "An act to further promote temperance and suppress the evils of intemperance, and to restrict the consumption of spirituous, vinous, malted, fermented, or other intoxicating liquors in this state. * * *" The following presently pertinent sections of that law may be appropriately set out at this point:

"Section 1. That it shall be unlawful for any railroad company, express company, or other common carrier, or any officer, agent or employee of any of them, or any other person to ship or to transport into, or to deliver in this state in any manner, or by any means whatsoever, any spirituous, vinous, malted, fermented or other intoxicating liquors of any kind from any other state, territory or district of the United States, or place noncontiguous to, but subject to the jurisdiction of the United States, or from any foreign country, to any person, firm or corporation within the territory of this state, when the said spirituous, vinous, malted, fer-

mented or other intoxicating liquors, or any of them, are intended by any person interested therein to be received, possessed, sold, or in any manner used, either in the original package, or otherwise, in violation of any law of this state now in force, or in violation of any law that may be hereafter enacted in this state, or take effect therein."

"Sec. 4. That it shall be unlawful for any person, firm or corporation to accept from any railroad company, express company, or other common carrier, or any officer, agent or employee of any of them, or from any other person any delivery of the liquors mentioned in section 1 of this act, or any of them, when transported into this state, or delivered in this state in any manner, or by any means whatsoever from the points or places mentioned in section 1 of this act, where the said person, firm or corporation so accepting such delivery intends to receive, possess, or sell, or in any manner use in original package or otherwise, the said liquors, or any of them, in violation of any laws of this state now in force, or of this act or of any law that may be hereafter enacted in this state or take effect therein."

"Sec. 12. That it shall be unlawful for any person, firm or corporation, (1) to receive or accept delivery of, or to possess or to have in possession at any one time whether in one or more places, and whether in original packages or otherwise, more than one-half gallon of spirituous liquors, or more than two gallons of vinous liquors, or more than five gallons of malted liquors, when in kegs, or more than sixty pints when in bottles, or more than one gallon of any other intoxicating or fermented liquor beyond those thus enumerated; or (2) to receive, accept delivery of, possess, or have in possession more than one gallon of spirituous liquors, or four gallons of vinous liquors, or more than ten gallons of

malted liquors, including beer and ale, when in kegs, or one hundred and twenty pints in bottles, or more than two gallons of any other fermented or intoxicating liquors beyond those thus enumerated, within any four consecutive weeks, whether in one or more places, but this section shall not apply to the possession of wine or cordial made from grapes or other fruit grown and raised by the person making the same for his own domestic use, when such person keeps such wine or cordial for his own domestic use on his own premises, but this section shall apply upon its enactment into law to such receipt, or acceptance of deliveries, or possession of such liquors respectively, occurring at any place or locality or within any territory in this state, where and within which it shall then be unlawful to sell, keep for sale, or otherwise dispose of said liquors, and it shall become applicable in respect to such receipt or acceptance of deliveries or possession of such liquors occurring at other places or localities, and within other territory in this state when and as soon as it shall become unlawful to sell, keep for sale, or otherwise dispose of such liquors at such places or localities or within such territory; this section shall not affect or modify any existing law or any law enacted at this session of the Legislature in so far as it regulates the sale or keeping for sale of alcohol, or wine for a defined purpose, by wholesale or retail druggists.

"Sec. 13. That any of the following facts shall constitute prima facie evidence that the liquors mentioned in the subdivisions of this section, respectively, are kept, or had in possession for sale, contrary to law, or for other unlawful disposition thereof, to-wit: (1) The possession of more than one-half gallon of spirituous liquors at any one time, whether in one or more places. or (2) the possession of more than two gallons of vinous

liquors at any one time whether in one or more places. (3) The possession of more than five gallons of malted liquors, when in kegs, or more than sixty pints in bottles, at any one time, whether in one or more places. (4) The delivery to a person, firm or corporation, or any officer, agent or servant of any of them, of more than one gallon of spirituous liquors, or more than four gallons of vinous liquors, or of more than ten gallons of malted or fermented liquors including beer and ale, when in kegs or more than one hundred and twenty pints in bottles, within any four consecutive weeks, whether in one or more places. (5) The possession of more than two gallons of any intoxicating liquors other than those enumerated in the preceding subdivisions of this section, whether in one or more places; but this section shall not apply to the possession of wine or cordials made from grapes or other fruit grown and raised by the person making the same for his own domestic use, when such person keeps said wine or cordial for his own domestic use on his own premises, nor to alcohol or wine authorized by law to be sold by druggists for defined purposes. This section shall not repeal or modify any other statute of the state declaring what shall constitute the presumption of or prima facie evidence of guilt, of the violation of any law of the state for the promotion of temperance or for the suppression of the evils of intemperance, and this section is in addition to and supplemental to other statutes declaring such presumption or declaring such prima facie evidence of guilt. But this section shall apply upon its enactment into law to all possessions and deliveries of liquors as hereinabove stated when occurring at any place or localities and within any territory of this state, where and within which it shall then be unlawful to sell, keep for sale, or otherwise dispose of said liquors, and it shall become applicable to such pos-

sessions and deliveries at other places and localities, and within other territory in this state, when and as soon as it shall become unlawful to sell, keep for sale, or otherwise dispose of such liquors at such place, or localities or within such territory."

"Sec. 19. That this act shall be construed in harmony with all statutes of the United States relating to the transportation of the liquors mentioned in section 1 of this act into this state from points or places outside of the state mentioned in section 1 of this act, and other federal statutes bearing upon interstate shipments of such liquors."

"Sec. 22. That, in all prosecutions under this act for unlawful shipments of liquors mentioned in section 1 of this act into this state, the offense shall be held to have been committed in any county of the state through which or into which said liquors have been carried or transported, or in which they have been unloaded, or to which they have been conveyed for delivery."

Section 23 provides penalties and punishments for violation of the provisions of the law. It is clear that, if the Bonner Anti-Shipping Bill is a valid enactment, forbidding the receipt, or acceptance, or delivery, or the possession of the character of liquors constituting the shipment tendered by Whittle, in the quantity contained therein, regardless of the fact that the consignee only intended to devote these liquors to personal or family use or consumption, the carrier's refusal to accept this shipment for transportation and delivery, or either, into "dry territory" in the state of Alabama, was justified, and the compulsory process sought by the bill, and granted by the court below, on submission on bill and answer, was laid in error. The purpose undertaken to be expressed in and made effective by the Bonner

Law was and is to appropriate and to avail of the oppor-
tunity afforded by the Webb-Kenyon Law to render ef-
fectual and effective the laws enacted by the Legislature
of Alabama in the interest of temperance, and in ad-
vancement of the suppression of the evils of intemper-
ance, in the use or consumption of intoxicating liquors
in this state.

It is the complainant's (appellee's) theory, and the
bill so asserts, that the Bonner Law, as presently perti-
nent, is void for the following reasons:

(1) That section 12 violates section 1 of the Con-
stitution (1901) of Alabama, which enumerates as
among the inalienable rights of men the rights of "life,
liberty and the pursuit of happiness."

(2) That section 12 is void under the declarations of
section 35 of the Constitution of Alabama, which reads:
"That the sole object and only legitimate end of govern-
ment is to protect the citizen in the enjoyment of life,
liberty, and property, and when the government assumes
other functions it is usurpation and oppression."

(3) That section 12 violates the fourteenth amend-
ment of the Constitution of the United States, providing
that no state shall make or enforce any law which shall
abridge the privileges or immunities of citizens of the
United States, and also the provision thereof against the
deprivation, by any state, of the citizen's life, liberty,
or property without due process of law.

(4) That it offends the "commerce clause" of the
Constitution of the United States.—Article 1, § 8.

The substance of the Webb-Kenyon Law, title and
body, is written in these words:
"An act divesting intoxicating liquors of their interstate
     character in certain cases.

"Be it enacted, etc., that the shipment or transporta-
tion, in any manner or by any means whatsoever, of any

spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one state, territory, or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, * * * or from any foreign country into any state, territory, or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such state, territory, or district of the United States, or place noncontiguous to but subject to the jurisdiction thereof, is hereby prohibited."

The constitutionality of the Webb-Kenyon Law is not directly questioned on this appeal. Its constitutional validity was affirmed by this court in *Southern Express Co. v. State,* 188 Ala. 454, 66 South. 115: Justice de Graffenried setting forth the views of this court. On the brief for appellant decisions of other jurisdictions to like effect are collated. A notable contribution to the judicial literature on this subject is afforded by the opinion of Chief Justice Sidney Smith in *American Express Co. v. Beer,* 65 South. 575. There is, however, a contention for the appellee that asserts conditionally the constitutional invalidity of the Webb-Kenyon Law as upon the theory that, if it is construed to authorize a state to "prescribe the manner or method by which, or the quantity or times in which," intoxicating liquors "may be received or possessed, and further attempts to enforce these regulations as to interstate shipments," the Webb-Kenyon Law would then be subject to the fatal objection that it has undertaken to delegate to the states powers with respect to interstate commerce that by the Constitution of the United States are reposed

exclusively in the Congress. The argument for appellee, according to our understanding of it, as well as his assertion of legal results which we have attempted to briefly set forth, is rested upon the premise that the Webb-Kenyon Law could only permit, and in fact only permits, the states to affect interstate shipments by a total prohibition of the traffic [sale] in or possession of intoxicants within the borders of the state. This contention will be later considered.

(1) The power of the Congress "to regulate commerce among the state" undoubtedly necessarily comprehends the power to define what shall be commerce among the states, and, with a view to the appropriate exercise of its power, to distinguish "between things deleterious and things beneficial or innocuous," and, in natural consequence, to deny, absolutely or conditionally, entrance into such commerce to those things which are deleterious.—*Sou. Express Co. v. State, supra,* 66 South. 115; *State of West Va. v. Adams Express Co.,* 219 Fed. 794, 802, 135 C. C. A. 464, where apt authorities, made by the Supreme Court, are noted. That the generally familiar and hardly estimable baneful effects wrought, upon the social order and upon individuals, by the intemperate use of intoxicating liquors justified Congress, in its obvious effort to remove the impediment to the effectual enforcement of state laws, against the traffic in intoxicants and the evils of intemperance, afforded by the theretofore unrestricted right to place such liquors in interstate commerce, in assigning such liquors to the class of deleterious substances, cannot be doubted; and the correctness of the conclusion of the national authority that such liquors are not worthy to be accorded the unqualified protection and advantages which that authority is wont to accord and does accord to innocent substances and things capable of introduction into such commerce is beyond question.

(2) The Webb-Kenyon Law seems to this court, as it did to the court in the fourth circuit (219 Fed. 801, 135 C. C. A. 464, Judge Woods writing), that "the terms of the statute are so plain and unambiguous that we are unable to perceive that its interpretation requires any resort to construction." It is a prohibitory enactment. Its plainly declared purpose is to divest intoxicating liquors of their interstate character, with reference to interstate commerce, "in certain cases." In the certain cases contemplated and described therein, intoxicating liquor is not and cannot become the subject of, and be protected as, lawful interstate commerce.—*Sou. Express Company v. State, supra,* 66 South. 115, 118, 119. It is, in those certain cases, "forbidden commerce." In the certain cases described intoxicating liquors must be, can only be, regarded and treated, when their movement is from one state into another, as if the Constitution had not contained the clause committing to the Congress the exclusive right to regulate interstate commerce.—*American Express Company v. Beer,* 65 South. 373, 380. In defining the object of the prohibition authoritatively made by Congress with respect to interstate commerce, the national authority described classes of intoxicants, and in so doing based the federal designation of the objects of the national inhibition upon a status fixed by valid state enactments governing the subject of intoxicating liquors. The inhibition, as respects the right to place in interstate commerce intoxicating liquors intended to serve as the instruments with which to violate valid state laws, is in no sense an attempt to delegate national authority or power to a state or states, but is, on the contrary, the direct expression of the national authority and the immediate visitation upon the subject-matter of the national power.

(3) The Webb-Kenyon Law "prohibits the shipment or transportation of liquor from one state into another,

not only when it is intended to be sold in violation of
any law of such state, but when it is to be received or
possessed, or in any manner used, in violation of the
state law."—*State of West Va. v. Adams Express Company, supra.*  There is nothing in the Webb-Kenyon Law
to indicate any intention to restrict its beneficent and
considerate effect to only those cases where total prohibition, with respect to the sale, receipt, or possession
of intoxicating liquors, is the statutory status in a
state.  The dominant idea in the law is to deny the
privilege and protection of lawful interstate commerce
to the instrument of intended violation of any valid
state law affecting the use, possession, receipt, etc., of
intoxicating liquors.  The plain terms of the statute inhibit any right to enter intoxicants in interstate commerce where the purpose is unlawful; and whether the
purpose is unlawful depends upon the rule or rules
established by valid state enactments.  The Congress
was not content to simply say that intoxicants intended
to serve as the instruments of violations of valid laws of
the state of delivery should not enjoy the rights,
privileges, and protection of interstate commerce.
Doubtless, in order to avert any misapprehension in the
premises, that body defined, in a comprehensive, yet entirely definite, way, every possible act, relation, or association with intoxicating liquors that pertinent, valid
state legislation under the police power might provide
to regulate, prohibit, or in any wise govern the article
or its use.  In the circumstances made by this federal
enactment it is not possible to soundly assert that the
action of the states in any valid use of the police power
residing in the states is a regulation of interstate commerce; and in so doing the Congress has but appropriated the valid laws of the states, affecting intoxicants, to define, as it is clearly authorized to do, the

article that the Congress has forbidden lawful entry into interstate commerce.

(4-6) The matter of real controversy in this case is whether section 12 of the Bonner Law is void, because violative of the Constitutions in the particulars before mentioned. And this question may be further resolved into this form of inquiry: Is the police power of this state validly exerted when, in promotion of the suppression of the evils of intemperance, the state enactment places a limitation in respect of quantity upon the possession or receipt of intoxicating liquors within its borders? In *Noble State Bank v. Haskell,* 219 U. S. 111, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, this most notable announcement was made by the Supreme Court, through Justice Holmes: "It may be said in a general way that the police power extends to all great public needs.—*Camfield v. United States,* 167 U. S. 518 [17 Sup. Ct. 864, 42 L. Ed. 260]. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality, or strong and preponderant opinion, to be greatly and immediately necessary to the public welfare."

These particularly illuminating announcements of rule and doctrine were set forth by Chief Justice Fuller *in Re Rahrer,* 140 U. S. 545, 554, et seq., 11 Sup. Ct. 865, 866 (35 L. Ed. 572):

"The power of the state to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order, and prosperity is a power originally and always belonging to the states, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive. And this court has uniformly recognized state legislation, legitimately for police purposes, as not in the sense of the Constitu-

tion necessarily infringing upon any right which has been confided expressly or by implication to the national government. * * * In short, it is not to be doubted that the power to make the ordinary regulations of police remains with the individual states, and cannot be assumed by the national government, and that in this respect it is not interfered with by the fourteenth amendment.—*Barbier v. Connally,* 113 U. S. 27, 31 (5 Sup. Ct. 357, 28 L. Ed. 923]."

Intoxicating liquor is universally regarded as a proper subject for the application of the police power. Its capacity or quality, at least, to not only create, but to aggravate, evils prejudicial to various phases of the social order and to the welfare of individuals and their dependents admittedly authorize and require the exertion of the police power upon it. And since the right of intoxicants, intended for unlawful purposes, to enter interstate commerce, is withdrawn by the Webb-Kenyon Law, valid state laws governing the article, enacted under the police power of the state, operate upon intoxicants immediately upon their movement, across the state boundary, into the state of delivery.—*Sou. Express Company v. State, supra,* 66 Sou. 115; *American Exp. Co. v. Beer,* 65 South. 574, 580. The power of the state to prohibit the manufacture or sale of intoxicants is never now questioned. It is generally accepted and finally established. The object and purpose of all our laws governing the subject of intoxicating liquors is "to promote temperance and prevent drunkenness. * * * The evil to be remedied is the use of intoxicating liquors as a beverage. * * * "—*Carl's Case,* 87 Ala. 17, 6 South. 118, 4 L. R. A. 380; *Marks v. State,* 159 Ala. 71, 84, 85, 48 South. 864, 133 Am. St. Rep. 20. Freund, in his work on the Police Power, at section 204, thus amplifies the idea expressed in our cases above quoted: "It

is certainly the more conservative view to look upon the control of the liquor traffic as a means of protecting the community from crime and the financial burdens of pauperism; but it is also clear that the police power, resting upon this incontestable ground, is turned into a power to protect the weak individual from his own weakness, into a power to prevent the wasteful expenditure of money and time, and finally into a power to impose upon the minority the sentiments or prejudices of the majority of the community, as to what is morally right and good."

See *Crowley v. Christensen,* 137 U. S. 86, 90, 91, 11 Sup. Ct. 13, 34 L. Ed. 620.

The government does not interfere with or impair "any one's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks, for general or individual use, as a beverage, are, or may become, hurtful to society. * * * Those rights are best secured, in our government, by the observance, upon the part of all, of such regulations as are established by competent authority to promote the common good. No one may rightfully do that which the law-making power, upon reasonable grounds, declares to be prejudicial to the general welfare."—*Mugler v. Kansas,* 123 U. S. 623, 662, 663, 8 Sup. Ct. 273, 298 (31 L. Ed. 205). Neither the fourteenth amendment, nor any other, "was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people. * * * "—*Barbier v. Connolly,* 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923. All personal and related rights and privileges, whether arising out of contracts or out of or pertaining to property, are subject to the lawfully exercised police power of the state, directed to the pro-

tection of the public health, the public morals, and the public safety.—*N. O. Gas Co. v. La. Light Co.,* 115 U. S. 650, 672, 6 Sup. Ct. 252, 29 L. Ed. 516; *Mugler v. Kansas,* 123 U. S. 623, 665, 666, 8 Sup. Ct. 273, 31 L.·Ed. 205.

The declarations of our Constitution guaranteeing the rights of life, liberty, and the pursuit of happiness, and asserting the limits of rightful functions in government, on the one hand, and, on the other hand, denouncing the excession of such limits as usurpation and oppression, were never intended to restrict the rightful exercise of the police power by the state. All such rights are assured by the organic laws, but the assurance is ever subject to the power of police, to be exercised for the public welfare, that from necessity inheres in the government of the state. It is the peculiar function of the lawmakers to ascertain and to determine when the welfare of the people requires the exercise of the state's police powers, and what are appropriate measures to that end, subject only to the power and authority of the courts to see, when assured to the requisite certainty, that the measures of police so adopted do not arbitrarily violate rights protected by the organic laws. —*Purity E. & T. Co. v. Lynch,* 226 U. S. 192, 33 Sup. Ct. 44, 57 L. Ed. 184. In a case involving a state enactment, of course attributable for authority to the police power, declaring void certain "future" contracts, it was said in *Otis v. Parker,* 187 U. S. 606, 609, 23 Sup. Ct. 168, 170 (47 L. Ed. 323), Justice Holmes writing that: "If a state thinks that an admitted evil cannot be prevented except by prohibiting a calling or transaction not in itself necessarily objectionable, the courts cannot interfere, unless, in looking at the substance of the matter, they can see that it 'is a clear, unmistakable infringement of rights secured by the fundamental law.'—*Booth v. Illinois,* 184 U. S. 425, 429 [22 Sup. Ct. 425, 46 L. Ed. 623]."

In the case of *Purity E. & T. Co. v. Lynch, supra,* the Supreme Court had to consider the validity of an enactment of the state of Mississippi prohibiting the sale of "Poinsetta," a nonintoxicating beverage, in that state. Writing in expression of the unanimous judgment of the Supreme Court, Justice Hughes said, in part: "That the state in the exercise of its police power may prohibit the selling of intoxicating liquors is undoubted. * * * It is also well established that when a state, exerting its recognized authority, undertakes to suppress what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make its action effective. It does not follow that, because a transaction separately considered is innocuous, it may not be included in a prohibition the scope of which is regarded as essential in the legislative judgment to accomplish a purpose within the admitted power of the government. * * * With the wisdom of the exercise of that judgment the court has no concern: and unless it clearly appears that the enactment has no substantial relation to a proper purpose, it cannot be said that the limit of legislative power has been transcended. To hold otherwise would be to substitute judicial opinion of expediency for the will of the Legislature, a notion foreign to our constitutional system. * * * It was competent for the Legislature of Mississippi to recognize the difficulties besetting the administration of laws aimed at the prevention of traffic in intoxicants. It prohibited, among other things, the sale of 'malt liquors.' In thus dealing with a class of beverages which in general are regarded as intoxicating, it was not bound to resort to a discrimination with respect to ingredients and processes of manufacture which, in the endeavor to eliminate innocuous beverages from the condemnation, would

facilitate subterfuges and frauds and fetter the enforce-
ment of the law. A contrary conclusion, logically
pressed, would save the nominal power, while preventing
its effective exercise. The statute establishes its own
category. The question in this court is whether the
Legislature had power to establish it. The existence of
this power, as the authorities we have cited abundantly
demonstrate, is not to be denied simply because some
innocent articles or transactions may be found within
the prescribed class. The inquiry must be whether,
considering the end in view, the statute passes the
bounds of reason and assumes the character of a merely
arbitrary fiat. That the opinion is extensively held that
a general prohibition of the sale of malt liquors, whether
intoxicating or not, is a necessary means to the sup-
pression of trade in intoxicants, sufficiently appears
from the legislation of other states and the decision of
the courts in its construction. * * * We cannot
say that there is no basis for this widespread conviction.
The state, within the limits we have stated, must decide
upon the measures that are needful for the protection
of its people, and, having regard to the artifices which
are used to promote the sale of intoxicants under the
guise of innocent beverages, it would constitute an un-
warrantable departure from accepted principle to hold
that the prohibition of the sale of all malt liquors, in-
cluding the beverage in question, was beyond its re-
served power."

The doctrine of this case particularly consists with
that announced in our own cases of *Feibelman v. State,*
130 Ala. 122, 30 South. 384, and *Marks v. State,* 159 Ala.
71, 80, 48 South. 864, 133 Am. St. Rep. 20.

It is earnestly urged for the appellee that the doctrine
and the pronouncements of governing principle made in
the majority opinion in our case of *Eidge v. City of Bes-*

*semer,* 164 Ala. 599, 51 South. 246, 26 L. R. A. (N. S.) 394, conclude to the invalidity of the Bonner Law, because of unwarranted invasion of property rights in intoxicants and because of unjustifiable abridgement of the privileges and immunities of the citizen. This court was divided in opinion in that case—the majority holding to the view that the ordinance therein considered had the effect to prohibit the possession of intoxicants at places and under circumstances innocent in themselves, and that, having no reasonable relation to the prohibition of the sale of intoxicants, it was void as an unreasonable exercise of the police power by the municipality; that, had the ordinance forbidden the keeping of the intoxicants for sale, it would have escaped the court's condemnation. The three dissenting members of the court interpreted the ordinance as governing the possession, etc., of intoxicants *in or at any place where any drinks or beverages were sold or kept for sale,* and that it was an obviously reasonable expression and application of authorized police power to prevent evasions of the law prohibiting the sale, etc., of intoxicants. It thus appears that the primary point of division in the court in that case arose out of the differences in respect of the interpretation, the meaning, of the ordinance, and that the real matter of contest in this case was but collaterally, incidentally, involved in the view prevailing with the three dissenting Justices.

*Eidge v. City of Bessemer,* 164 Ala. 599, 51 South. 246, 26 L. R. A. (N. S.) 394, cannot be regarded or accepted as a governing authority on this appeal for the following reasons:

(a) There the ordinance of a municipality, not a statute of the state, was the subject of consideration and decision: an ordinance going beyond and in advance of any state statute then of force; and note of this fact

was taken in the opinion in that case in the following words: "The ordinance in question does not make an offense against the municipality of those acts which are denounced by the law of the state; that is to say, it does not prohibit the sale of intoxicants, nor does it create the separate and distinct offense of having or keeping liquors and intoxicating beverages with the unlawful intent."

(b) The quotation, on pages 601 and 602 of 164 Ala., on page 252 of 51 South., from section 39 of Black on Intoxicating Liquors, is in conflict with this statement of the long since accepted general legislative purpose, in this state, in the adoption of prohibitory statutes, as set forth in *Marks v. State*, 159 Ala. 71, 84, 85, 48 South. 864, 869 (133 Am. St. Rep. 20), upon the apt authority of *Carl's Case*, 87 Ala. 17, 6 South. 118, 4 L. R. A. 308: "The statute under consideration is but the extension of kindred prohibition statutes to the entire state which were theretofore local.   True, it contains provisions not heretofore embodied in local statutes, which new provisions must yet be construed.   The objects and purposes of those statutes had been defined by the courts; and, being incorporated and re-enacted in the general law, they bring with them such judicial constructions. The main object and purpose of all is the same.   Some may be restricted, and some more extensive and exclusive than others; but the main object and purpose of all, as said by Justice Somerville, in *Carl's Case*, 87 Ala. 17, 6 South. 118, 4 L. R. A. 308, is 'to promote temperance and prevent drunkenness.   The mode adopted to accomplish this end is the prevention of the sale, the giving away, or other disposition of intoxicating liquors. The evil to be remedied is the use of intoxicating liquors as a beverage, rather than as an ingredient of medicines and articles of toilet, or for culinary purposes, and the

object of the law in this particular must not be lost sight of in its interpretation.' "

(c) The approval of the majority view in the case of *State v. Williams,* 146 N. C. 618, 61 S. E. 61, 17 L. R. A. (N. S.) 299, 14 Ann. Cas. 562, which concerned the validity of an enactment of the Legislature of that state, is disapproved; that decision being, in our opinion, unsound.

(d) The doctrine of the case of *West Virginia v. Gilman,* 33 W. Va. 146, 10 S. E. 283, 6 L. R. A. 847, is opposed to the doctrine or principle of our decision in *Williams v. State,* 179 Ala. 50, 60 South. 903, and the *Gilman Case* is not now regarded as any measure of authority here on the question of the validity vel non of the Bonner Law.

In the consideration of controversies involving the propriety vel non of enactments purporting to be the exercise of the police power, against admitted evils, the acceptance of the fact that the thing, or the right to or the unrestricted enjoyment of the thing, sought by the enactment to be affected, is property, does not at all conclude the question to be determined. That fact is but an element of the inquiry; and this is true for the reason, as was ruled in *Ex parte Mayor of Florence,* 78 Ala. 419, and numerous other decisions delivered here and elsewhere, that one's already acquired property in intoxicants is ever held subject to the superior, yet lawfully exercised, power of police inhering in the government of the state. Having the universally recognized power to qualify the enjoyment of the ordinary, usual rights and privileges with respect to intoxicants that are generally, normally accorded to other subjects of ownership and enjoyment, by the lawful exercise of the police power of the state, the true, primary, controlling inquiry in such circumstances is whether the enactment is a

reasonable exercise by the state of the police power with respect to the property or personal rights affected or to be affected thereby—not alone whether a personal or property right or immunity has been or will be affected by the enactment. It would be certainly as unfortunate, if not more so, to unduly minimize the police power of the state by an unwarranted exaltation of personal or property rights as it would be to minimize the latter by the unwarranted exaltation of the former. And we here appropriately set in these words of Justice Field in *Soon Hing v. Crowley,* 113 U. S. 703, 109, 5 Sup. Ct. 730, 734 (28 L. Ed. 1145) : "All sorts of restrictions are imposed upon the actions of men, notwithstanding the liberty which is guaranteed to each. It is liberty regulated by just and impartial laws;" as well this expression from Justice Holmes in *Noble State Bank v. Haskell,* 219 U. S. 104, 113, 31 Sup. Ct. 186, 188 (55 L. Ed. 112, 32 L. R. A. [N. S.] 1062, Ann. Cas. 1912A, 487) : "There are many things that a man might do at common law that the states may forbid. He might embezzle until a statute cut down his liberty."

The generally conceded propriety of the exercise of the police power in respect of the prohibition of the manufacture and sale of intoxicants does not consist with some expressions in the opinion in our case of *Dorman v. State,* 34 Ala. 216, supra, wherein this court then (upwards of 50 years ago) said, after declaring that all property was equally sacred, that it was "not permitted to listen to a suggestion that this particular species of property is so pernicious in its influences upon society that the best interests of the state would be promoted by its destruction." To the immediate contrary the Supreme Court pronounced in *Mugler v. Kansas,* 123 U. S. 623, 8 Sup. St. 273, 31 L. Ed. 205, when a state enactment had so declared. In this regard the general

acceptance of what is the rightful exercise of the police power has advanced and progressed, so that what in other days would not have found favor or countenance, with lawmakers or courts, as appropriate or proper manifestations of the police power, is now never questioned or doubted.—*Noble State Bank v. Haskell, supra.* Justice Brown, writing for the Supreme Court in *Holden v. Hardy,* 169 U. S. 363, 392, 393, 18 Sup. Ct. 383, 42 L. Ed. 780, takes account of this measured step of progress in the developing necessity for the governments to have recourse, in the changing public interests, to the police power and to apply its force and authority to new public needs. Our *Dorman Case,* while expressly noting the subjection of property rights and rights arising out of property to the superior police power of the state, (see 34 Ala. 243, 294), cannot be now accepted as a governing authority for measuring the constitutionality of an enactment putting forth the police power of the state in the government of the subject of intoxicants.

To our minds *Mugler v. Kansas,* 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, lays the premise for the logically unescapable conclusion that the Bonner Law offends no constitutional provision, invades no right guaranteed or protected by the Constitutions, state or federal, if indeed, it is not a direct authority inviting and supporting that conclusion. We think the correctness of this proposition is demonstrated by expressions of Justice Harlan, who wrote for the court. In this opinion this language of Justice Grier, in the *License Cases,* 5 How. 504, 631, 632 (12 L. Ed. 256) is approvingly quoted: "The true question presented by these cases, and one which I am not disposed to evade, is whether the states have a right to prohibit the sale and consumption of an article of commerce which they believe to be pernicious in its effect, and the cause of disease, pauperism, and crime.

\*    \*    \*    Without attempting to define what are. the peculiar subjects of limits of this power, it may safely be affirmed that every law for the restraint and punishment of crime, for the preservation of the public peace, health, and morals, must come within this category. \*    \*    \*    It is not necessary, for the sake of justifying the state legislation now under consideration, to array the appalling statistics of misery, pauperism, and crime which have their origin in the use or abuse of ardent spirits.    The police power, which is exclusively in the states; is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority."

It was further said for the court: "It is, however, contended that, although the state may prohibit the manufacture of intoxicating liquors for sale or barter within her limits, for general use as a beverage, 'no convention or Legislature has the right, under our form of government, *to prohibit any citizen from manufacturing for his own use, or for export, or storage,* any article of food or drink not endangering or affecting the rights of others.'    The argument made in support of the first branch of this proposition, briefly stated, is that in the implied compact between the state and the citizen certain rights are reserved by the latter, which are guaranteed by the constitutional provision protecting persons against being deprived of life, liberty, or property without due process of law, and with which the state cannot interfere; that among those rights is that of manufacturing for one's use either food or drink; and that while, according to the doctrines of the commune, the state may control the tastes, appetites, habits, dress, food, and drink of the people, our system of government, based upon the individuality and intelligence of the citizen,

does not claim to control him, except as to his conduct to others, leaving him the sole judge as to all that only affects himself. It will be observed that the proposition, and the argument· made in support of it, equally concede that the right to *manufacture drink for one's personal use is subject to the condition that such manufacture does not endanger or affect the rights of others.* If such manufacture does prejudicially affect the rights and interests of the community, it follows, from the very premises stated, that society has the power to protect itself, by legislation, against the injurious consequences of that business. As was said in *Munn v. Illinois,* 94 U. S. 113, 124 [24 L. Ed. 77], while power does not exist with the whole people to control rights that are purely and exclusively private, government may require 'each citizen to so-conduct himself, and so use his own property, as not unnecessarily to injure another.'

"But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety. It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the·police

power of the state.   There are, of necessity, limits be-
yond which legislation cannot rightfully go.   While
every possible presumption is to be indulged in favor
of the validity of a statute (*Sinking Fund Cases*, 99 U.
S. 700, 718 [25 L. Ed. 496]), the courts must obey the
Constitution rather than the lawmaking department of
government, and must, upon their own responsibility,
determine whether, in any particular case, these limits
have been passed.   'To what purpose,' it was said in
*Marbury v. Madison*, 1 Cranch. 137, 176 [2 L. Ed. 60],
'are powers limited, and to what purpose is that limita-
tion committed to writing, if these limits may, at any
time, be passed by those intended to be restrained? The
distinction between a government with limited and un-
limited powers is abolished, if those limits do not con-
fine the persons on whom they are imposed, and if acts
prohibited and acts allowed are of equal obligation.'
The courts are not bound by mere forms, nor are they to
be misled by mere pretenses.   They are at liberty—
indeed, are under a solemn duty—to look at the sub-
stance of things, whenever they enter upon the inquiry
whether the Legislature has transcended the limits of
its authority.   If, therefore, a statute purporting to
have been enacted to protect the public health, the pub-
lic morals, or the public safety has no real or substan-
tial relation to those objects, or is a palpable invasion
of rights secured by the fundamental law, it is the duty
of the courts to so adjudge, and thereby give effect to the
Constitution.

   "Keeping in view these principles, as governing the
relations of the judicial and legislative departments of
government with each other, it is difficult to perceive
any ground for the judiciary to declare that the prohibi-
tion by Kansas of the manufacture or sale, within her
limits, of intoxicating liquors for general use there as

a beverage, is not fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of ardent spirits. There is no justification for holding that the state, under the guise merely of police regulations, is here aiming to deprive the citizen of his constitutional rights; for we cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the *general use of intoxicants,* nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree, at least, traceable to this evil. If, therefore, a state deems the absolute prohibition of the manufacture and sale, within her limits, of intoxicating liquors for other than medical, scientific, and manufacturing purposes, to be necessary to the peace and security of society, the courts cannot, without usurping legislative functions, override the will of the people as thus expressed by their chosen representatives. They have nothing to do with the mere policy of legislation. Indeed, it is a fundamental principle in our institutions, indispensable to the preservation of public liberty, that one of the separate departments of government shall not usurp powers committed by the Constitution to another department. And so, if, in the judgment of the Legislature, *the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question.* So far from such a regulation having no relation to the general end sought to be accomplished, the entire scheme of prohibition, as embod-

ied in the Constitution and laws of Kansas, might fail,
if the right of each citizen to *manufacture intoxicating
liquors for his own use as a beverage were recognized.
Such a right does not inhere in citizenship.*  Nor can it
be said that government interferes with or impairs any
one's constitutional rights of liberty or of property when
it determines that the manufacture and sale of intoxicat-
ing drinks, for general *or individual use, as a beverage,*
are, or may become, hurtful to society, and constitute,
therefore, a business in which no one may lawfully en-
gage.   Those rights are best secured, in our government,
by the observance, upon the part of all, of such regula-
tions as are established by competent authority to pro-
mote the common good.   No one may rightfully do that
which the lawmaking power, upon reasonable grounds,
declares to be prejudicial to the general welfare."—
*Mugler v. Kansas,* 123 U. S. 659-663, 8 Sup. Ct. 273, 31
L. Ed. 205.   (Italics supplied.)

If the right of common law to manufacture an intoxi-
cating liquor for one's own personal use, out of one's
own materials by the application of one's own personal
effort, may be forbidden by appropriate legislation under
the police power, as was expressly ruled in *Mugler v.
Kansas, supra,* it cannot be logically or soundly asserted
that the receipt of possession of more than a specified
quantity at one time may not be forbidden by statute,
especially when the sale or other disposition of intoxi-
cants is forbidden in the state's effort to promote tem-
perance and to suppress the evils of intemperance by
visiting its power upon one of the means usually produc-
tive of intemperance, viz., the traffic therein, or, as has
been before quoted from our *Marks* and *Carl Cases, ante,*
to remedy the evil present in "the use of intoxicating
liquors as a beverage."  The power confirmed in *Mulger
v. Kansas* must necessarily comprehend the lesser mani-

festation of a like power by regulating the quantity to be received or possessed at one time in "dry territory" in the state. Furthermore, it would appear to be but the assertion of a self-evident truth to say that, since one may be validly forbidden to sell his intoxicating liquor to another, that other may be validly forbidden to buy the article from him; and if one may be validly forbidden to sell, and necessarily validly forbidden to deliver, the article to another, that other may be validly forbidden to accept delivery. As to the seller, the prohibitions stated would operate upon him and upon his property, but not in the sense or with the effect of infringing any constitutional right or immunity (*Dorman's Case, supra*); whereas, in the case of the buyer, the prohibitions would operate in anticipation, qualifying his right, in the interest of the public welfare as determined by legislative authority, to acquire a property interest in the article above a defined quantity at one time.

The extent to which the police power may be exerted and the circumstances of the cases which will warrant its exertion, which the promotion of the public welfare may present for its exercise, have not been defined. It is not desirable that it should be done.—*Noble State Bank v. Haskell, supra.*

We may note at this point in the opinion some illustrative instances,—out of a greater number including those afforded by this court in the decisions above cited, —where ancillary prohibitions of acts and conduct, innocent in themselves, have been sustained and confirmed as an exercise of the police power of the state; and so upon the theory that some valid legislative purpose might be more certainly made effective, or that evasions of the laws might be prevented or hindered of accomplishment.

The *Lynch Case*, quoted before, and the *Feibelman Case*, will suffice to illustrate the activity of this prin-

ciple with respect to intoxicants. In the cases of *Davis v. State,* 68 Ala. 58, 44 Am. Rep. 128, and *Mangan v. State,* 76 Ala. 60, this court held that the prohibition against the sale or transportation (off the premises) of seed cotton after sunset and before sunrise was not a violation or invasion of any constitutional rights. The Supreme Court in *Patsone v. Pennsylvania,* 232 U. S. 138, 34 Sup. Ct. 281, 58 L. Ed. 539, sustained as entirely valid a state enactment that undertook to make more effective a law of that state which intended the preservation of game therein by prohibiting the possession (with limited exceptions) of a shot gun or rifle by foreign born unnaturalized residents: the court declaring that such weapons were not necessary for any other purpose, thereby in effect conceding that such weapons might be used for other lawful purposes. The case of *Silz v. Hesterberg,* 211 U. S. 31, 29 Sup. Ct. 10, 53 L. Ed. 75, is cited in the last-mentioned decision, and further illustrates the rule under view in this connection. There the possession of game, already taken, whether in the state of enactment or shipped in, during the closed season, was forbidden. The case of *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385, is to like effect; the prohibition in that instance being visited upon devices for catching fish in certain waters. The case of *Ah Sin v. Wittman,* 198 U. S. 500, 25 Sup. Ct. 756, 49 L. Ed. 1142, involved the validity of a state enactment making it unlawful to visit barred or barricaded houses or rooms where gambling instruments were to be seen. The court sustained the enactment, even though under it an innocent visitor might be penalized. In *Delamater v. South Dakota,* 205 U. S. 93, 27 Sup. Ct. 447, 51 L. Ed. 724, 10 Ann. Cas. 733, recently followed and applied by this court in *State v. Delaye,* 193 Ala. 500, 68 South. 993, the Supreme Court vindicated an enactment forbidding the

solicitation of orders for intoxicants by a non-resident of the state. This court had already, in *Moog v. State,* 145 Ala. 75, 41 South. 166, sustained such a law as applied to residents of the state. The remedy for an admitted evil, viz., the use of intoxicants as a beverage, was found to fairly include the act of soliciting orders. This instance strikingly illustrates the authorized progress manifested by and for the exercise of the police power by the state and the recognition by the courts of the fact that all commands or prohibitions ancillary and reasonably related to the state's purpose to promote temperance and to suppress the evils of intemperance, whether through the prohibition of the traffic as the chief means to that end or not, cannot be thwarted or annulled on any idea that constitutional rights are thereby violated or invaded.

Our opinion is that section 12 of the Bonner Law is not in conflict with any of the mentioned provisions of the Constitutions, state or federal.

(7) The constitutional validity of section 13 of the Bonner Law, establishing rules of evidence, is shown by the following, among other readily accessible, authorities: *State v. Barrett,* 138 N. C. 630, 50 S. E. 506, 1 L. R. A. (N. S.) 626, and note thereto; *Fitzpatrick v. State,* 169 Ala. 1, 53 South. 1021.

The policy of our laws respecting the subject of intoxicating liquors being to promote temperance and to suppress the evils of intemperance, and to these ends having prohibited the sale or other disposition thereof in the territory to which the six-quart shipment of whisky was consigned by Whittle to Farmer, the present inquiry is: Does the prohibition of the receipt or possession of more than the stipulated (in section 12) quantity of whisky at one time bear a reasonable relation to the major purposes contemplated, as stated by the lawmakers? The

fact, if so, that the quantity of whisky here involved may be, when separately considered, innocuous, or its capacity for the production of harmful results inconsequential, does not itself conclude in denial of the lawful power of the state to forbid the possession or receipt of that quantity at one time; for the legislative judgment must be accorded a reasonable latitude to consider of and to decide what measures of an ancillary nature are necessary to make effective the major objective stated. The law under review does not deny to consumer or consignee in "dry territory" the right to receive or to possess at one time what would seem to be an entirely adequate quantity of the character of beverage here involved for the satisfaction or gratification of a reasonable appetite or desire for such liquors. Looking, as doubtless the Legislature, did, to the historic and more or less familiar fact that evasions of laws against the sale or other distribution of intoxicants, are habitually undertaken by the lawlessly disposed, it was conceivable that the minimization of the quantity of whisky, etc., one might lawfully receive or possess in a "dry territory," at one time, would render, directly, the unlawful sale or other disposition less likely to occur; and, if breaches of the law were committed by reason of the offender's disposal, within a definite period, of quantities aggregating more than that the laws permit the individual to lawfully possess or to receive during that period, that detection of the lawless operator would be the more easily effected. These entirely reasonable considerations, among others readily conceivable and leading to the like conclusions, forbid the entertainment of the view that section 12 of the Bonner Law is merely an "arbitrary fiat," without reasonable relation to the major purposes the lawmakers have attempted to effect.

The court below erred. The bill is without equity. The carrier was justified in its refusal of the shipment

[Long v. Powell.]

of whisky described in the pleading; and the injunction to coerce its reception of packages of intoxicants forbidden by law to be possessed or delivered at a point in "dry territory" in the state of Alabama was improvidently ordered to issue or issued. The decree appealed from is reversed, the demurrer sustained, and the injunction is dissolved. The bill is dismissed.

Reversed and rendered.

ANDERSON, C. J., and SOMERVILLE, GARDNER, and THOMAS, JJ., concur in the opinion. MAYFIELD and SAYRE, JJ., concur in the conclusion.