(77 South. 755)

## STATE v. T. J. MATTOX CIGAR & TOBACCO CO. (3 Div. 324.)

(Supreme Court of Alabama. Jan. 24, 1918.)

1. STATUTES ☞114(6)—SUBJECTS AND TITLES OF ACTS.

Acts 1915, p. 1, entitled "An act to promote temperance," etc., and prohibiting liquors containing maltose or glucose, is not offensive to Const. 1901, § 45, requiring each law to contain but one subject, which shall be clearly expressed in the title.

2. STATUTES ☞114(6)—SUBJECTS AND TITLES OF ACTS.

Acts 1915, p. 8, entitled "An act to further suppress the evils of intemperance," etc., and section 2½ thereof, prohibiting certain liquors, is not offensive to Const. 1901, § 45, requiring each act to contain but one subject, which shall be clearly expressed in the title.

3. APPEAL AND ERROR ☞931(1) — PRESUMPTIONS.

Presumption in favor of ruling of lower court has no application where the testimony is taken before a commissioner appointed by the court, and not in open court before the judge who renders the decision.

4. INTOXICATING LIQUORS ☞134—PROHIBITED LIQUORS—"ENZYME."

The beverage known as "Besto," containing an enzyme, which is an unorganized ferment, and containing either maltose or glucose or a substitute therefor, is prohibited as a device or substitute for a beverage prohibited by Gen. Acts 1915, pp. 1, 8, 31, §§ 1, 2½, 31, prohibiting certain liquors.

Appeal from Circuit Court, Montgomery County; Gaston Gunter, Judge.

Injunction by the State against the T. J. Mattox Cigar & Tobacco Company. From an order dissolving the temporary injunction and dismissing the bill, the State appeals. Reversed and rendered.

W. L. Martin, Atty. Gen., and P. W. Turner, Asst. Atty. Gen., for the State. J. Lee Holloway, of Montgomery, for appellee.

This cause was submitted and considered under rule 46 (65 South. vii [1]), and the opinion of the court was delivered by Mr. Justice THOMAS.

In this case injunction is sought by the solicitor of Montgomery county to abate, under the prohibition statutes, an unlawful drinking place. The bill avers, among other things, that the respondent operates in the city of Montgomery a soft drink stand, "which is a common nuisance or unlawful drinking place, because said respondent at said place sells, keeps for sale, or maintains said place for the drinking of a beverage known as 'Besto,' which beverage is a substitute or device for beer." The prayer is for an injunction to restrain respondent from selling or keeping for sale said beverage known as "Besto" and from maintaining a place for the drinking of said beverage.

After answer and proof, the judge of the circuit court decreed that said beverage was "a nonintoxicating and nonalcoholic drink within the meaning of the state statute, and therefore in selling this beverage the respondent did not make his place of business a public nuisance," and dissolved the temporary injunction and dismissed the bill.

The appeal is taken by the state and the Attorney General; the assignment of errors presenting for review this action of the trial court.

Respondent's insistence is that those portions of the prohibition act of 1915 (Acts 1915, § 1, p. 1, and section 2½, p. 8) purporting to declare that "any other beverage which is the production of maltose or glucose, or in which maltose or glucose is a substantial ingredient," is a prohibited liquor or beverage, are offensive to section 45 of the Constitution.

[1, 2] We find no merit in this contention. There is but one subject embraced in the title of either of the two acts in question, and that subject is clearly expressed. The matter in question is germane to such respective titles. Chief Justice McClellan declared the right of the Legislature, in the effort to promote temperance, to discourage the use or consumption of prohibited liquors and beverages, and to secure obedience to and prevent the evasion of the prohibition laws in connection with the prohibition of the manufacture, sale, or disposition of alcoholic, vinous, malt, fermented, or brewed, liquors or beverages, to enforce a like prohibition of certain other liquors or beverages affording opportunity for evasions of such laws. He said:

"It is common knowledge that most malt liquors are intoxicating and harmful when used excessively, and are capable of excessive use as a beverage. The sale of all such, of course, the Legislature has the power to prohibit. But, if the prohibition should in terms go only to the sale of intoxicating malt liquors, there would be left open such opportunities for evasions of the law, and there would arise such difficulties of proof, as that the law could not be effectively executed; and the lawmakers having the undoubted power to prohibit and to prevent the sale of intoxicating malt liquors, and to enact to that end a law which can be executed so as to secure it, and finding that this cannot be accomplished without extending the prohibition to all malt liquors, whether intoxicating or not, such extension, necessary to prevent the sale of intoxicants, is as essentially the proper exercise of the police power as the inhibition with

reference to intoxicants. Our prohibition statutes very generally have provisions which are merely intended to be ancillary to, and to prevent evasions of, or to avoid difficulties of proof in respect of, their main purpose, to prevent the sale of intoxicants." Feibelman v. State, 130 Ala. 122, 124, 125, 30 South. 384, 385.

In State ex rel. Black v. Southern Express Co., 200 Ala. 31, 75 South. 343, Mr. Justice McClellan pertinently observes:

"The traffic in intoxicants in this state has been prohibited, to the legislatively avowed end of promoting temperance and of preventing drunkenness. * * * In addition, valid ancillary prohibitions and regulations, reasonably conceived to be in aid of the stated major purposes entertained by the lawmakers, have been enacted."

This declared right of the Legislature to reasonably prohibit the manufacture, sale, or other disposition of other liquors, whether intoxicating or not, in connection with the prohibited liquors, has been reaffirmed in Dinkins v. State, 149 Ala. 49, 43 South. 114; Lambie v. State, 151 Ala. 86, 91, 44 South. 51; Marks v. State, 159 Ala. 71, 80, 48 South. 864, 133 Am. St. Rep. 20; Ex parte Woodward, 181 Ala. 97, 106, 61 South. 295; State ex rel. Black v. Delaye, 193 Ala. 500, 519, 520, 68 South. 993, L. R. A. 1915E, 640; Southern Express Co. v. Whittle, 194 Ala. 406, 422, 423, 69 South. 652, L. R. A. 1916C, 278; State ex rel. Hugo L. Black v. Southern Express Co., 75 South. 343;[2] L. & N. R. R. Co. v. State (App.) 76 South. 505, 512; Theatrical Club v. State, 74 South. 969;[3] Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205; Purity Extract Co. v. Lynch, 226 U. S. 192, 33 Sup. Ct. 44, 57 L. Ed. 184; Wilson v. New, 243 U. S. 332, 346, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938; James Clark Distilling Co. v. Western Maryland Railway Co., 242 U. S. 311, 37 Sup. Ct. 180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845; Butterfield v. United States, 241 Fed. 556, 154 C. C. A. 332; Southern Pacific v. Jensen, 244 U. S. 205, 217, 37 Sup. Ct. 524, 61 L. Ed. 1086. Such subsequent rulings indicate that the decision in Elder v. State, 162 Ala. 41, 50 South. 370, has not controlling effect as to the statute now under consideration.

The trial court rested the decision on the fact that the beverage known as "Besto" is "a nonintoxicating and nonalcoholic drink within the meaning of the statute," and thus overlooked the reasonable ancillary prohibitions and regulations of the statutes adopted in aid of the major purpose of the prohibition laws. State ex rel. Black v. Southern Express Co., supra; Southern Express Co. v. Whittle, supra; Feibelman v. State, supra.

[3] Did, then, the beverage in question in fact fall within the reasonable prohibitions of the statute? Gen. Acts 1915, § 1, p. 1, and section 2½, p. 8, and section 31, p. 31. The presumption in favor of the ruling of the lower court declared to obtain in Andrews v. Grey, 74 South. 62,[4] has no application, where the testimony is taken before a com-

missioner appointed by the court, and not in open court, before the judge rendering the decision.

[4] A deputy sheriff of the county testified that he bought of respondent a bottle of this beverage and drank the same; that it looked, tasted, and smelled like beer. On this phase of the evidence, and the bearing thereon of section 31, p. 31, of the Acts of 1915, defining the liquors and beverages the subject of the prohibition laws, including among those prohibited "any device or substitute for any of them," Judge Samford has aptly written:

"This was intended to prevent the keeping for sale and selling of beverages that looked like prohibited liquors, so that those persons who were trying to avoid and thwart the various laws for the promotion of temperance could not use the imitations as a fence, to hide and cover the sale of the real thing. Therefore a liquor that foams like beer, smells like beer, looks like beer, tastes like beer, and is put up in bottles like beer, and has a name that suggests a very popular and well-advertised beer, is a substitute or device." Dees v. State (App.) 75 South. 645.

In the instant case, though the evidence shows that the name, as well as the bottles in which the beverage was contained, was different from that used for beer, there was a similarity, in the respects indicated, between the beverage served at respondent's place and beer. Lambie v. State, supra.

Of the chemical analysis of this beverage Dr. Ross, state chemist, testified on direct examination that he made such an analysis, and obtained this result: Alcohol, 0.43 per cent.; reducing sugars, as maltose, 4.03 per cent.; total solid matter, 6.13 per cent.; mineral matter, 0.11 per cent.; phosphoric acid, 0.027 per cent.; albuminoid, 0.24 per cent.; that this beverage did not correspond with alcoholic or spirituous liquors, nor with rum, gin, or vinous liquors; that he did not consider it as beer; that, being carbonated, it was effervescent; that Besto in taste more resembled malt than other drinks, though he "would not consider it a good substitute for beer"; and that it was nonintoxicating. On cross-examination this witness testified:

That he could not say positively whether it was a brewed drink, "as it might have gone through a portion of the brewery process"; that it contained 0.43 per cent. of alcohol; and that, if allowed to stand in an open vessel it could increase (in alcohol), as germs from the air might cause fermentation. "Q. Increase to over 0.51 per cent. alcohol? A. Yes. Q. I will ask you if this Besto looks, smells, and tastes like beer? A. Looks and tastes something like a malt beverage. Q. Did it smell like malt beverage? A. Slight odor like malt beverage. * * * The odor and taste are very much milder than beer. Q. In your analysis had the reducing sugars any maltose? A. In this case practically all the reducing sugars had presence of maltose."

Witness further stated:

That some sugar is an essential or material ingredient of a beverage of this kind; "that is, maltose or some other sugar is a characteristic ingredient of this kind of drink; that, if maltose isn't present, some other sugar would be a material or essential constituent" thereof.

In reply to the question, "Would you say that maltose was a substantial ingredient of Besto?" witness answered:

"In the sense that it is an important or material constituent, it might be considered substantial in that sense, though some other sugar might take the place of it, cane sugar for instance. Q. This was not cane sugar? A. No."

Witness further stated:

That under his definitions of a "substantial ingredient" of the beverage, Besto, "it [maltose] may be considered a substantial ingredient or characteristic ingredient of a drink of this kind"; that maltose is an ingredient of malted or brewed drinks; that "the analysis failed to show whether or not Besto is derived from malt, or whether it has been through any part of the brewing process."

Being asked if there was any substitute in Besto for malt, this witness answered:

That he could not say positively, but that "a number of drinks of this character are prepared from materials other than malt, which are a substitute for malt, and such beverages have some characteristics of malt beverages. Q. Would you say it had some characteristics as malt beverages? A. It has the taste slightly similar to malt beverages."

Witness continued, stating:

That the substitute used in Besto in whole or in part "might have been malt or some substitute for malt"; that "if malt has not been used in the preparation of the beverage, some substance that yields constituents similar to that would be derived from malt are used in the preparation."

Witness, in answer to the question whether "malt or a substitute" was used in the preparation of the bottle of Besto chemically examined by him, replied that:

"An enzyme or ferment derived from malt is sometimes used as a substitute for malt, and, on the other hand, there are unmalted cereals used sometimes instead of malted grain. I couldn't say whether, if malt wasn't used, some ferment or enzyme was used, or, if malted grain wasn't used, then some unmalted cereal may have been used as a substitute."

To the question, "Then the maltose sugar in Besto was derived from malt or cereal or a reduction of malt?" witness replied:

"The maltose may have come from malted grain, or unmalted cereal. * * * I cannot say positively, as the analysis doesn't show conclusively whether malt has or has not been used in the preparation of this beverage."

The learned chemist in this answer practically defines the word "enzyme." However, it may not be out of place to note that the word is generally defined as:

"An unorganized or unformed ferment, in distinction from an organized or living ferment; a soluble or chemical ferment. Ptyalin, pepsin, diastase, and rennet are good examples of enzymes." Webster's Inter. Dict. p. 499.

Or as:

"Any of the unorganized ferments, as diastase, maltin, pepsin, trypsin, etc., which exists in seeds," etc. Volume 2, Cent. Dict. 1958.

Dr. Remson, in his work on Organic Chemistry, defines maltose as:

A "carbohydrate formed by the action of malt on starch. Malt, which is made by steeping barley in water until it germinates, and then drying it, contains a substance called 'diastase,' which has the power of effecting changes and similar to some of those effected by the ferments." Remson's Organic Chemistry, p. 200.

Webster's New International Dictionary, p. 1306, defines maltose as:

"A crystalline sugar formed from starch by the action of diastase (as in malt and saliva), and hence important physiologically and in brewing and distilling; malt sugar. It is further formed by the action of diastase on glycogen and of dilute acids on starch. Maltose is dextrorotatory and easily fermentable."

This court has defined malt liquors to be:

"The product of a process by which grain is steeped in water to the point of germination, the starch of the grain being thus converted into saccharine matter, which is kiln dried, then mixed with hops, and, by a further process of brewing, made into a beverage. The term embraces porter, ale, beer, and the like." Marks v. State, 159 Ala. 71, 81, 48 South. 864, 868 (133 Am. St. Rep. 20).

The authorities show that maltose is derived from the action of a certain ferment of malt on sugar. Under the evidence, if malt is present in the beverage in question, it is as maltose. Maltose, a diastase or by-product of malt, though, relatively speaking, small (as compared to the whole), is a leaven that may accomplish the making of the drink, one in which malt is partly used, one within the inhibition of the statute. The manufacturer of the beverage in question testified, of its manufacture, that "its ingredients are mixed together and cooked; the liquid is then run into vats and kept in refrigeration;" that if it is permitted to ferment "it would go to creating alcohol"; that the maltose in Besto is derived from "sugar and malt"; and that maltose and glucose are the foundation of practically all soft drink syrups. This witness further testified that the beverage would not be mistaken for beer; that it does not have the appearance, taste, or smell of beer.

It appears, however, that the beverage in question was made by a process of mixing the ingredients, and cooking and cooling—three important and necessary processes in brewing. Webster's New Internat. Dict. title, "Brewing." In Encyclopedia Britannica, same title, brewing is said to consist of grinding, mashing, boiling, cooling, fermenting, cleansing, racking, and storing. Volume 4, pp. 508, 513. Whether or not it comes within the process of brewing, the beverage is made from maltose, or from a substitute therefor, and falls within the class of beverages prohibited as being a device or substitute for a beverage prohibited by the statutes. Dees v. State, supra.

It follows from the foregoing that there was error in dissolving the temporary injunction and dismissing complainant's bill. And judgment is here rendered reinstating the case, and making perpetual against respondent the injunction prayed in the bill.

Reversed and rendered.

ANDERSON, C. J., and MAYFIELD and SOMERVILLE, JJ., concur.

ANDERSON, C. J. (concurring). I realize that my concurrence in the result in this

·case is not in thorough accord with my views ·expressed in the case of Elder v. State, 162 Ala. 41, 50 South. 370, concurred in by Mayfield and Sayre, JJ. But the objections there advanced against the statute and the result have been removed by the subsequent decisions of this court as well as the case of Purity Extract Co. v. Lynch, 226 U. S. 192, 33 Sup. Ct. 44, 57 L. Ed. 184, and other authorities. I therefore yield my views as previously entertained to the weight of authority, and concur in the opinion and conclusion of Justice THOMAS.